UNITED STATES DISTRICT COURT
DISTRICT OF EASTERN MASSACHUSETTS

CASE NUMBER: 04-10614RWZ

PETER J. DONOVAN, pro se,          )
                                   )
          Plaintiff                )
                                   )
v.                                 )
                                   )
CITY OF WOBURN, et. al.            )
                                   )
          Defendants               )
_____)

BRIEF IN SUPPORT OF PLANITIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## I. STATEMENT OF CASE

The amended complaint is 22 pages long and contains 111 paragraphs. The Statement of Undisputed Material Facts has 49 paragraphs with over 75 Exhibits (Ex. hereafter). The Plaintiff will try to simplify case as much as possible. Plaintiff, Peter J. Donovan, has been trying to obtain a liquor license in the city of Woburn since 1995. In March 1995 the WLC issued a license to PJD *"indicating that it was the best presentation they have seen in eleven years"* under his corporation The Boston Beer and Wine Company, Inc. with the condition that he don't sell hard liquor. In June 1995, the WLC revoted to deny license to Donovan on a 1 to 1 vote (Maguire for, Galante against) because they (WLC) could not enforce the condition. PJD appealed this June 1995 decision to the ABCC and they (ABCC) rejected the appeal indicating that Woburn did not have a beer and wine license.

This June 1995 vote was very troubling because WLC Galante who was the only person to vote against license, her family had two competing applications on file and her family was the only people to oppose applicant from getting license in March 1995. According to Ed Donohoe

1     in a conversation with WLC Chairman Dennis Donovan, *"Galante's family was giving all kinds*

2     *of grief because of she voted to issue license in March"* (Ex. 9E, page 10 answer #8).

3         In and around October 1995, PJD started speaking out against WLC members especially

4     Galante (Exs. 2B,11B). In fact PJD filed suit against members of the WLC and the Mayor in

5     January 1996 focused on getting Galante removed from her voting on this particular license

6     because of her family wanting said license and other laws the WLC were violating (Exs. 9B,

7     9B1, 9B2) . This matter was resolved in April/May 1996. It is alleged that Donovan's campaign

8     help get his father, Dennis Donovan removed from the WLC in May 1996 (Ex. 10D). It is also

9     alleged that Donovan's campaign helped get Galante removed from WLC in February 1997. To

10    this day, certain politicians dislike PJD for what he did to his father and Galante (Exs. 10A, 10C

11    and 10E). In May 2002, this dislike was quite apparent in a case before MA. Courts. In the

12    questioning of PJD by Woburn's City Solicitor, Thomas Lawton, all Lawton was focused on was

13    PJD and his father. Wentworth was present during this questioning.

14         In addition in 1997, Donovan filed papers with District Attorney regarding WLC

15    violating open meeting laws – DA ruled against WLC on this matter (Exs. 9G, 9G1, 9G2). In

16    1997, Donovan questioned the Mayor's new appointee (McCaffery) to the WLC – this matter

17    forced Maguire to re-register his political party affiliation as a Republican in order for him to

18    remain on the WLC (Ex. 9C). In 1998 Donovan filed a suit in Federal Court under RICO and

19    other violations against members of the WLC (past and present), the Mayor (past and present),

20    other politicians, members of the Galante family and local politically connected package store

21    owners (Exs. 9H, 9H1, 9H2, 9H3, 9H4, 9H5, 9H7). This suit cost the city of Woburn and

22    package store owner's money to defend (Ex. 11I). Based on local insider information, many

23    people were very upset about this suit. In an affidavit, Wentworth states _ *"that PJD is not of*

- 2 -

1    *good character*" and *"that he (Wentworth) has never heard anyone say something nice about the*

2    *newspaper articles covering this story"* (Ex 9H2, pages 1 and 4).    This case was dismissed

3    without prejudice by this court in 2000 (Ex. 9H7). Also, one of Donovan's campaigns was

4    against WLC member Maguire for his alleged illegal activities.  Right after Donovan was

5    question by state police investigators about Maguire, he was not parking his trucks on city

6    property.  And in 2001 it is alleged, Maguire did not get a full time job with the city based

7    partially on a letter from Donovan regarding Maguire sent to city councilman, mayor and

8    newspapers (Exs. 9F, 9F1, 9F2, 9F3).  Donovan continued this campaign up until July 2002.

9         In June 1996, Donovan reapplies for license under The Boston Beer and Wine Company,

10   Inc. and was denied license on "public need" and "zoning".  This time the vote was 3 to 0.

11   Galante, Maguire and Wentworth voting against issuing license to Donovan (Exs 2A, 2D).

12   Donovan appeals to ABCC and they remand matter back to WLC in November 1996 (Ex. 2E).

13   In February 1997, the WLC again votes on license (Ex. 2F); Galante states "public need" as her

14   reason to deny license (Ex. 2F page 2);  Maguire states "public need" as his reason to deny

15   license (Ex. 2F page 2); Wentworth states zoning and delivery for his reason to deny license (Ex.

16   2F pages 2 and 3).  Donovan again appeals this WLC decision to ABCC with hearing held in

17   May 1997.  In June/July 1997 ABCC rules against Donovan affirming WLC decision.  Pursuant

18   to MGL c. 30a, Donovan appeals ABCC decision to MA Superior Court.  In June 2000, MA

19   Superior Court remanded Donovan's license appeal back to city after it ruled that the WLC

20   decision was arbitrary and capricious (Ex. 2G and 2H).

21         Since matter was remanded back to city in June 2000, the WLC have always contended

22   that PJD's proposed location was illegally zoned and would not hold a public hearing on PJD's

23   application. The WLC sought zoning opinions from the city solicitor and the building

1    commissioner not knowing all the relevant facts regarding PJD amended business plan. This

2    zoning matter went back and forth over a three year period and in May 2003 the zoning matter

3    was finally resolved between the City of Woburn and PJD and approved by MA Courts.

4          On July 31, 2003, the WLC finally held a hearing on Donovan's license application after

5    the zoning issued was resolved (Ex. 8B). The WLC again rejected the application stating "no

6    public need" existed for another package store license to be issued in the city of Woburn and

7    other issues. On August 28, 2003, PJD filed an appeal pursuant to G.L. c. 249, s.4 in MA Courts

8    seeking relief in the nature of certiorari (Ex. 8J, 8K, 8L, 8M, 8N). In March 2004, PJD filed a

9    complaint in Federal Court alleging that the WLC violated his 14th Amendment Rights to Equal

10   Protection and other federal violations.

11         The WLC's decision dated August 5, 2003 (Ex. 8D) rejecting PJD's application for a

12   package store license must be vacated for the following reason: (i) the WLC denial lie in the

13   basis of a trivial or trumped-up "public need" claim and other frivolous claims not to issue said

14   license to Donovan because they don't like him, while "maintaining a policy and practice of

15   routinely granting new licenses with conditions or without conditions, renewing existing license

16   that have delivery licenses, allowing other license holders to relocate and expand, allow other

17   gift type companies to operate in the same office park etc. for the sole and exclusive purpose of

18   exacting retaliation and vengeance against" Donovan for him being a constant critic of Woburn's

19   political system, undermining public officials and other issues listed in statement of facts - thus

20   denying Donovan his Right to Equal Protection.

21                                    **II. <u>ARGUMENT</u>**

22   **A. Exhausting of Administrative Remedies:**

23

1    Donovan has exhausted his administrative state remedies under state law and is waiting

2    on Massachusetts Court of Appeals to render a decision on said matter (Ex. 8N).  Donovan could

3    not find any case law indicating that he cannot pursue a federal claim under Equal Protection at

4    the same time a state case is pending on different claims.

5

6    **B. WLC's Decision dated August 5, 2003 Violated Plaintiff's Equal Protection Rights as an**

7    **Individual Pursuant to the 14th Amendment to the US Constitution:**

8

9    The Equal Protection Clause states "nor shall any State…deny to any person within its

10    jurisdiction the equal protection of the laws." (U.S. Const. Amend XIV, s1).  Mr. Donovan asks

11    this court to enforce and protect his right to be treated fairly as others have been who have been

12    in the same situation as Donovan without being retaliated against by city officials (Wentworth

13    and McCaffery) for Donovan, and not limited to the following, undermining them, filing suits

14    against them, reporting them to state and federal authorities for illegal activity, openly criticizing

15    them etc.

16    The Supreme Court has "recognized successful equal protection claims brought by a

17    "class of one, where the plaintiff alleges that (he) has been intentionally treated differently from

18    others similarly situated and that there is no rational basis for the difference in treatment. "

19    Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2001).

20    In individual also may state a claim under Equal Protection if he can show that state

21    government took an action that "was a spiteful effort to "get him for reasons wholly unrelated to

22    any legitimate state objective." Esmail v. MaCrane, 53 f. 3d 176, 180 (7th Cir. 1995).  The Equal

23    Protection Clause provides a remedy when a powerful public official pick(s) on a person out of

24    "sheer vindictiveness." Id. At 178.  This type of discrimination has been characterized as the

25    creation of a "class of one." Indiana State Teachers Ass'n v. Board of Sch. Comm'rs, 101 F. 3d

1    1179, 1181-82 (7th Cir. 1996). To prevail, the plaintiff must demonstrate that the government is

2    treating unequally those individuals who are prima facie identical in all relevant respects, see id.,

3    and that the cause of the differential treatment is "totally illegitimate animus toward the plaintiff

4    by the defendant." Olech v.Willowbrook, 160 F.3d 386, 388 (7th Cir. 1998), aff'd on other

5    grounds, 528 U.S. at 565. If the "defendant would have taken the complained-of action anyway,

6    even if it didn't have the animus, the animus would not condemn the action." Id. I11 will must

7    be the sole cause of the complained-of action." See id. A showing of "uneven law

8    enforcement," standing alone, will not suffice. Id.

9         In addition, many lower federal courts have recognized that the Equal Protection Clause

10    is violated when a state purposely discriminates against a "class of one." One of the first such

11    decisions was authored by the eminent jurist, Learned Hand, in Burt v. City of New York, 156

12    F.2d 791 (2d Cir. 1946), a case in which an architect alleged that building officials of the City of

13    New York intentionally treated him differently from all other architects as a result of "personal

14    hostility." (156 F.2d 791, 791.) Judge Hand considered the complaint to allege adequately the

15    denial of equal protection of the laws, and Judge Hand considered that this Court's decision in

16    Snowden v. Hughes, 321 U.S. 1 (1944), "definitely settled it, that, if a complaint charges a state

17    officer, not only with deliberately misinterpreting a statute against the plaintiff, but also with

18    purposely singling out him alone for that misinterpretation, it is good against demurrer." (156

19    F.2D791, 792.) See also LeClair v Saunders, 627 F.2d 606, 609-610 (2d Cir. 1980), cert denied,

20    450 U.S. 959 (1981); Zeigler v Jackson, 638 F.2d 776, 779 (5th Cir. 1981); Ciechon v City of

21    Chicago, 686 F.2d 511, 522 (7th Cir. 1982); Yerardi's Moody Street Restaurant & Lounge, Inc.

22    v. Board of Selectmen, 878 F.2d 16, 21 (1st Cir. 1989); Rubinovitz v. Rogato, 60 F.3d 906, 911-

23    912 (1st Cir. 1995); Esmail v. Macrane, 53 F.3d 176, 179-180 (7th Cir. 1995).

1    In cases of this nature, the Appeals Court has stated that that it must *"consider whether*

2    *there is cause to believe that the agency, by gross illogic, has arbitrarily singled out and*

3    *individual from unequal and perhaps invidious treatment"* Yerardi's Moody St. Restaurant and

4    Lounge, Inc., 19 Mass. App. Ct. at 301. It also stated that *"it would offend equal protection to*

5    *refuse licenses to one group when others obtained licenses in similar circumstances. Id., 19*

6    *Mass. App. Ct. at 303, n.9. "A plaintiff can allege an equal protection violation by asserting that*

7    *state action was motivated solely by a "spiteful effort to get" him wholly unrelated to any*

8    *legitimate state objective ".* Esmail v. Macrane, 53F.3d 176 (C.A. 7 1995*). "The purpose of the*

9    *equal protection clause of the Fourteenth Amendment is to secure every person within a state's*

10   *jurisdiction against intentional and arbitrary discrimination, whether occasioned by express*

11   *terms of a statute or by its improper execution through duly constituted agents ".*

12   Donovan is a victim, just as much as members of other unpopular groups, of differential

13   treatment at the hands of a governmental actor for reasons patiently offensive to traditional

14   notions of fairness and justice. The Equal Protection Clause exists to protect citizens from

15   precisely such improperly motivated governmental action. Differential treatment in government

16   action motivated by the desire to punish one based on personal animus should not be

17   countenanced any more than race or sex-based discrimination when it comes to the Equal

18   Protection Clause. Indeed, one wonders why government – at least, good government would

19   want to argue otherwise. "If the power of government is brought to bear on a harmless

20   individual merely because a powerful state or local official harbors a malignant animosity toward

21   him, the individual should have remedy in federal court'. Esmail v. Macrane, 53 F. 3d 176, 179

22   (7th Cir. 1995). See also Yick Wo v. Hopkins, 118 U.S. 356, 369-70 (1886) ("When we consider

23   the nature and theory of our institutions of government, the principles upon which they are

1  supposed to rest, and review the history of their development, we are constrained to conclude

2  that they do not mean to leave room for the play and action of purely personal and arbitrary

3  power.") Here the Defendants injured Donovan by treating him differently and denied him said

4  license because they did not like him, which created the same practical harm as if they had

5  denied him the license because he is Irish. But the Equal Protection Clause "state(s) a

6  commitment to the law's neutrality where the rights of persons are at stake." _Romer_, 517 U.S. at

7  623.

8  Moreover, the human experiences tells us that one need not to be a member of a suspect

9  class (or any of typical class) to be politically disfavored or singled out for unfair treatment.

10  Indeed, governmental action that burdens only a few persons may require special scrutiny

11  because it likely carries fewer political consequences. *"Classifications should be scrutinized*

12  *more carefully the smaller and more vulnerable the class is. A class of one is likely to be the*

13  *most vulnerable of all"*.... Esmail, 53 F. 3d at 180. As this Court has recognized, "a status-based

14  (governmental action) divorced from any factual context from which (the Court can) discern a

15  relationship to legitimate state interests...is a classification of persons undertaken for its own

16  sake, something the Equal Protection Clause does not permit." _Romer_, 517 U.S. at 635.

17

18                          **III. The "Similarly Situated" Standard:**

19  The determination as to whether individuals are "similarly situated" for equal protection

20  purposes is an amorphous one. See Barrington Cove, 246 F.3d at 8. "' The test is whether a

21  prudent person, looking objectively at the incidents, would think them roughly equivalent and

22  the protagonists similarly situated. Much as in a lawyer's art of distinguishing cases, the

23  "relevant aspects" are those factual elements which determine whether reasoned analogy

- 8 -

1    supports, or demands, a like result. Exact correlation is neither likely nor necessary, but the

2    cases must be fair congeners. In other words, apples should be compared to apples.'" Id.

3    (citation omitted). See also Tapalian v. Tusino, 02-1732 (1st Fed District).

4

5    A. **Current Package Store in Woburn Comparison to Donovan:**

6    1. **Expansion and Relocation:** In August 1995, the WLC allowed Giles Liquor to relocate and

7       expand to the Westside of Woburn without scrutinizing them on public need. The expansion

8       was from 500 sf. to 1,700 sf.. Please note: Giles Liquor is owned by the family of Woburn

9       City Councilman, Scott Galvin. (Exs. 8R, 8E page 14).

10   2. **Expansion and Relocation:** In 1997, the WLC allowed Giles Liquor to relocate and expand

11      again from 1,700 sf. to 5,100 sf. without scrutinizing them on public need. (Exs. 8R, 8L, 8E

12      page 14).

13   3. **Expansion and Relocation:** In June 2000, the WLC allowed S&L Liquors to expand and

14      relocate from 2,000 sf. to 4,200 sf. without scrutinizing them on public need. (Exs. 8S, 8L, 8E

15      page 14).

16          The above license holders all have MGL c. 138 s. 15 licenses (off-premise liquor

17   licenses). MGL c. 138, s. 16A states;

18          Licenses issued under section twelve (on-premise - restaurant) or fifteen (off-
19          premise – package store) be automatically renewed for the next annual
20          license period upon application by the holder thereof during the month of
21          November and shall be automatically renewed for a renewal of a seasonal
22          license for the next seasonal license period upon application during the
23          month prior to the commencement of the seasonal period upon payment of
24          the fee, provided that said license is of the same type as the expiring license
25          and covers the same licensed premises. If the application does not meet the
26          conditions hereunder, it shall be treated as an application for a new license
27          and all the procedures set forth under Fifteen A shall be applicable thereto.
28

-9-

1    In other words, the WLC allowed other package store owners (one politically connected)

2    to expand and relocate without addressing their changed applications as a new license

3    application, thus not addressing public need, traffic, proximity to schools or churches thus

4    violating the law. Donovan had a new license application and the WLC denies him on "Public

5    Need" and other frivolous claims while allowing these other stores to expand and relocate. In an

6    affidavit filed in the MA Appeals Case, Wentworth states *that public need was addressed when*

7    *these licenses were first issued and did not need to be addressed again"*. (Ex. 8L ). In addition,

8    Wentworth stated in July 2003 regarding above expansion (Ex. 8B, page 57), *"The liquor*

9    *industry in my mind has changed dramatically. Before you either___you went in and ordered*

10   *whiskey, rye or beer. Now there's all sorts of wines. We have___they (meaning package store*

11   *owners) have a right to be able to properly display their wares. And that's one of the main*

12   *reasons that we allowed it"*. This is so far from what a reasonable business person would

13   conclude. Because it would be economic suicide for a retailer to substantial expand his business

14   without having a public need for said expansion. The package stores above doubled and tripled

15   in size. The average retail rent per square foot in Woburn is $25 per square feet. In Giles

16   expansion in 1997 from 1,700 sf to 5,100 sf., this increase in space would increase his rent by

17   $85,000 per year. (5,100 sf minus 1,700 sf = 3,400 x $25 per sf = $85,000 per year). No

18   business owner is going to incur an increase in rent of $85,000 per year just to display product as

19   Wentworth suggest! In addition, on March 10, 2005 before MA Court of Appeals Oral

20   Arguments – the defendant's suggested that the city of Woburn has seven wards throughout the

21   city and they have a package store in each ward and that is enough to satisfy need. If this court

22   reviews Ex. 8O the map of Woburn they will see that there is no package store located in the

23   northeast corner of the city, which happens to be the busiest section of the city during the work

1    week. The defendants know this and this is common knowledge throughout the city. MGL c.

2    138 dictates that the number of licenses issued per city or town is based on that city or town's

3    population, not the number of wards a city or town has. This is a clear violation of MGL.

4    4. **Delivery Licenses:** other package stores in the city of Woburn have been delivering product

5    within the city for years to residential addresses with no delivery schedule or restrictions (Ex.

6    8Q). But McCaffery and Wentworth, deny Donovan on his license application because his

7    (Donovan's) focus is on delivery to business addresses only with a limited delivery schedule

8    from Monday through Thursday up to 3PM. Plus all deliveries have to be signed for by a

9    person of age. (Ex. 8B, page 12).

10    5. **Zoning – McDonough v. WLC in 1992:** In 1992, the WLC denied Kevin McDonough on

11    public need for the same license (Exs. 15A, 15B, 15C). The WLC determined that the

12    proposed premises sought (800 Cummings Park – 320 Washington Street) by McDonough,

13    was allowed by right (Exs. 15C page 7, 3D). McDonough's proposed location is in the same

14    office park as Donovan's proposed locations and is directly across the street from Donovan's

15    proposed locations that he presented before the WLC in 2001, 2002 and 2003. The WLC did

16    not make McDonough go through the zoning process that they made Donovan go through.

17        It is common knowledge throughout the city that Donovan's proposed locations have

18    been used for retail for years going back before 1995. (Exs. 3A, 3B, 3C, 3D, 3F, 3G, 3H, 3I,

19    3J, 3K, 3L, 3M, 3N).

20        In March 1995 when the WLC did issue Donovan the license – zoning was never an issue

21    before them. In fact, the Building Commissioner issued an occupancy permit for Donovan's

22    business (Exs. 1C, 1D).

23    **B. Other Factors and Comparisons:**

1. **Delay Tactic #1:**  The WLC (especially Wentworth under the watchful eye of McCaffery) sought zoning opinions from city solicitor and building commissioner denying Donovan space at proposed locations (325 Washington Street, 30 Cedar Street and 345 Washington Street)- (Exs. 5B, 6D, 7A, 7B) while having common knowledge that retail has been allowed at Donovan's proposed locations for years and even knowing that they (WLC) determined that McDonough could operate a full liquor store at said location without conditions back in 1992.

The city all along has allowed retail at Donovan's proposed locations, these denials caused Donovan to loose proposed space and having him reapply for license again and again because his proposed space became occupied by another retailer.  The WLC made Donovan catch a moving target by seeking these zoning opinions!  That is why the May 2003 zoning settlement includes three property locations so this moving target will be eliminated. (Exs. 7Q, 7R, 7S, 7T).

In May 2001 – the WLC seek zoning opinion from city solicitor for 325 Washington Street (Ex. 5B). This location has a special permit to operate as a convenient/retail store. The city solicitor denies zoning.  The WLC denies license to Donovan based on public need (Maguire only) and zoning only (Maguire, Wentworth, McCaffery) (Ex. 5C pages 60, 61).

In November 2001 – the WLC seek another zoning opinion from Building Commissioner (BC hereafter) for 345 Washington Street and BC denies Donovan his proposed space based on there is no retail allowed at said location (Ex. 6D).  In February 2002, Rainbow Inc. moves to exact location and unit as Donovan's proposed location. Rainbow retails jungle gyms (Exs. 3A, 3M, 3M1).  This caused Donovan to seek another

1    location. Also in October 2002, Just Kidding! A Toy Store was allowed to occupy space at

2    345 Washington by the city of Woburn. A toy store!   (Ex.3L).

3        In May 2002, according to the Middlesex District Attorney office it was Wentworth

4    (WLC) who sought zoning opinion from BC for 30 Cedar Street - (Exs.7A, 7B, 7E page 2).

5    Again, BC denies Donovan's location based on that there is no retail allowed at said location.

6    In 2003, Edible Arrangements moves into 30 Cedar Street. Edible is a gift store like Donovan

7    has proposed – (Ex. 7E). This zoning opinion was appealed to MA Courts by Donovan and

8    was settled in May 2003. (Exs. 7Q, 7R, 7S, 7T).

9        Other gift stores offering the same types of corporate gifts Donovan has proposed are as

10   follows; Chocolate Truffle located at 200 Cummings Park has been at same location since

11   mid 1990's (Ex. 3G). Basket Builders located 400 Cummings Park moved to said location in

12   2004 (Ex. 3F). Cookies By Design located at 8 Cummings Park (345 Washington Street) has

13   been at said location since 2003 (Ex. 3H). These stores offer corporate gifts focusing on the

14   same business market in the same area as Donovan proposed. All of these stores are in the

15   same office park as Donovan's proposed location.   Other retailers that operated in same

16   office park over the years include; Hancock Paint, Party Works, Corporate Convenient Store,

17   Woodworker Warehouse, Picture Works, Direct Connect – Wireless Superstore, Active-

18   Electronic Component Depot, Alfa Computer etc (Exs. 3G, 3I, 3J, 3K). Plus the owner of the

19   property has advertised in the Boston Globe available retail space at these locations and

20   advertises retail space along Washington Street adjacent to properties in question - (Exs. 3B,

21   3C). Please note: all signs have to have sign permits issued by BC in city of Woburn.

22       Another type of store that mail orders beer and wine type product is Beer and Wine

23   Hobby Shop located at 155 New Boston Street, Woburn, MA. This store mail orders beer

1    and wine making kits and has walk in retail. This store has operated in the city for over 15

2    years with no scrutiny from BC or city officials about retail use in an Industrial Park zoned

3    location (Ex. 3N).

4        The WLC sought these opinions forcing Donovan to appeal BC decision all the way up

5    through MA. Courts. These sought after zoning opinions by the WLC were in violation of

6    case law and under the watchful eye of the city solicitor and other city officials. See

7    Bradshaw v. Board of Appeals of Sudbury, 346 Mass. 558, 194 N.E.2d 716 (1963). In

8    Bradshaw;

9        "It is not, however, within the jurisdiction of the licensing authority to pass on
10        zoning questions, nor within the jurisdiction of the zoning board to pass on the
11        propriety of the issuance of a liquor license".
12
13        Up until said zoning settlement in May 2003 between the city of Woburn and Donovan,

14    the above type gift stores thrived and flourished at the same location as Donovan proposed.

15

16    **2. Delay Tactic #2:** From 1992 to 2003 the WLC have denied all applicants the license on

17    "public need" forcing these applicants, including the plaintiff, to appeal said denials up

18    through MA Courts – thus delaying the issuing of license. In McDonough's and Donovan's

19    cases, both had large public support to issue license and really no public opposition. In

20    McDonough's case, Mayor Rabbit indicated to Ed Donohoe (Donovan's attorney at the time)

21    *"that it wouldn't look right if McDonough received the license because he was president of*

22    *the city council"* (Ex. 9E page 10).   It is alleged that these denials were in retaliation of

23    applicants reporting sitting mayors to state agency for corruption (McDonough and Rabbitt)

24    and retaliation for suing sitting mayors and WLC members in court and critizing local

25    politicians (Donovan on Rabbitt , Dever and Curran).

26

1    The city solicitor was very critical of the WLC delaying tactics in the Covino matter in

2    August 1994 for not hearing their license application (Ex. 16A).  Also, see Attorney Ed

3    Donohoe's comments in January 1995 when Donovan was applying for this license –

4    Chairman of the WLC was telling Donohoe *"it was not a good time to apply for this license,*

5    *wait until May" (Ex. 9E page 9 answer #5).*  Then sometime in 1994/1995, the former

6    chairman of the Woburn License Commission, Dennis Donovan, drafted the following notes

7    regarding this last package store license (Ex. 16B);

8

9    *"Delaying Tactic – New Mayor maybe next year.  Will hold up as much as possible".*

10

11    The above delay tactics are perfect examples of how political officials can abuse the

12    system if they don't like you or don't want you to have something.

13

14    **3. Conditions:**  The WLC has allowed Bickford's Restaurant to put nine conditions on their

15    full liquor license without scrutinizing them on said conditions (Ex. 13A, page 2 and 3).

16    One condition on Bickford's license was to serve beer and wine only.  In 1995, the city

17    solicitor and WLC (Galante) made a big fuss about Donovan putting a beer and wine

18    condition on a full liquor license when the WLC issued license to Donovan in March 1995

19    (Ex. 1A, 1B, 9B2 page 2 #5).  The city solicitor raised the issue of Hub Nautical Supply Co.,

20    Inc. v. ABCC, 422 NE2nd 1065.  The WLC and city solicitor never brought up the Hub

21    Nautical case in regards to Bickford's conditions (Ex.13A).

22    Furthermore, the WLC scrutinizes Donovan on his conditions after the city of Woburn

23    and BC agreed to said conditions.  These conditions were to comply with zoning.  It is

24    common knowledge throughout the Commonwealth, liquor licenses/zoning are conditioned

- 15 -

1    for many purposes and the WLC were well aware of these issues.  See <u>Building Department</u>

2    <u>for the City of Beverly decision dated August 8, 1996</u> (granting conditional license to Boston

3    Beer and Wine), <u>Town of Canton, Board of Appeals decision dated September 28, 1995</u>

4    (granting conditional license to Geerlings and Wade, Inc.), <u>ABCC decision regarding Finast</u>

5    <u>Liquors of Massachusetts dba Edwards Food Warehouse dated March 25, 1992</u>

6    (recommending city of Chicopee to issue package license with reasonable conditions as it

7    may deem in the public interest) and <u>ABCC decision regarding Candido and Monserrate</u>

8    <u>Fernandez dba Holyoke Mini Market October 27, 1993</u> (recommendation that the application

9    be granted with reasonable conditions including the condition that beer not be sold in single

10   bottles or cans.).  Most important, see <u>WLC regarding Bickford's Restaurant(</u>WLC

11   conditioning full liquor license file dated January 2004) -(Exs. 17A, 17B, 17C, 17D, 13A

12   page 2 and 3).

13   4.    **Blanket Policy:** In 1999, the State Court's decision was very critical on WLC's

14   decision on said license and indicated that having a "Blanket Policy" on said license is

15   arbitrary and capricious (Ex. 2G).  Since 1992, the WLC have seen and heard every possible

16   business type for said license.  In 1992, McDonough proposed a full package store.  WLC

17   denied McDonough on public need (15A, 15B, 15C).  In 1995, 1996, 1997, 2001 and 2003

18   Donovan proposed a mail order and corporate gift type business.  WLC denied Donovan on

19   public need and other issues.  It is alleged that the WLC is protecting this license for

20   someone as a political pay off or they are protecting certain package store owners from

21   competition by not issuing license.  The blanket policy remains on this last package store

22   license and the WLC is treating each applicant for said license much differently than others

1    who apply for other types of liquor licenses or other package store owners who have existing

2    licenses.

3    **IV. Analysis of Wentworth's and McCaffery's Voting Patterns on Donovan's Applications**

4

5    A. **Wentworth:**

6        1. In June 1996, Wentworth voted to deny license as follows; " *The reason for denial is*

7    *based on fact that retail sales are not allowed in I-P zone, and would require approval of*

8    *Building Commissioner, and that has not been requested"*.  Please note this was the first time

9    Wentworth voted on any license – he just became a member of the WLC in May 1996 (Ex.

10   2A page 2).

11       2. In February 1997, after ABCC remanded matter back to Woburn for further review

12   Wentworth adds the following to his denial (Ex. 2F page 2, 3);

13       -    *Retail sales are not allowed in an I-P zoned area, concurrence for exceptions to*

14            *that ordinance would require approval from the Building Commissioner, and that*

15            *was not requested by Mr. Donovan for that proposed address.*

16       -    *Law 138, sec 15 states: "Any sale of such beverages shall be conclusively*

17            *presumed to have been made in the store wherein the order was received from*

18            *customer".  Based on that statement, I did not believe that we had the authority to*

19            *grant a mail order/delivery sales license under sec. 15.  I don't feel that the best*

20            *interests of the City are served by mail order/delivery sales, due to concerns such*

21            *as proof of intoxication or proof of age.*

22   *3.*  In an Interrogatory dated 2/18/2000 – Wentworth states the following; *"I cannot in good*

23   *conscience, state that plaintiff (Donovan) is of good character"* (Ex 9H2 page 1).  Character

24   is one criteria on issuing a license under MGL c. 138 s. 15.  Wentworth would never bring

1  this up at a public hearing because he knows he would be sued for defamation – this is a

2  perfect example showing Wentworth dislikes Donovan.  Also in this Interrogatory - in

3  reference to editorials written by Donovan and newspapers articles regarding Donovan and

4  his company; Wentworth states:  *"Some articles certainly didn't speak well to good*

5  *character. "*  And *"Yes I never heard anyone defend them"* (Ex. 9H2 page 3).  Meaning that

6  people were talking negative to Wentworth about these news articles.

7     *4.*  In June 2001, Wentworth denies Donovan license as follows (Ex. 5C page 61):

8
9        *" I'm opposed to the issuance of the license because no one authority or this*
    *licensing board has the authority to bypass or ignore zoning requirements.*

10
11        *This is an O-P zone.  It is against the ordinance and also, as stated before, this*
    *required a special permit fro the City Council and we had no right to change that without*
12      *their proper authority.  Therefore, I'm opposed to issuance of the license"*

13

14     *5.*  In July 2003, Wentworth denies Donovan license on "public need" and other frivolous

15  issues (Ex. 8D).

16  **B. McCaffery**

17     **1.** In June 2001, McCaffery denies Donovan license as follows: (Please note this was

18  McCaffery's first time voting on Donovan's application.)  (Ex. 5C page 61).

19

20        *"The reason I'm opposed to it is because the letter here states in other words the*
21      *local licensing authority has no jurisdiction whatsoever to override or circumvent zoning*
22      *regulations through the exercise of its discretion.*

23        *I vote against it. "*

24

25     2.  In July 2003, McCaffery denies Donovan license on public need and other frivolous

26  issues (Ex. 8D).

27     3.  Other comments made by McCaffery in July 2003; *"that it was his personal opinion*

28  *(emphasis added) that we've got several liquor package stores here now.  We all kinds of*

- 18 -

1   *licenses, restaurants, and there's enough liquor in Woburn." (Ex. 8B page 31)* But, he has

2   voted in favor to allow Bickford's to obtain a liquor license with conditions in December

3   2003 and voted in favor to allow Restorante II Ducalli to obtain a liquor license in December

4   2004 (Exs. 13A, 14A).

5   *4.* Other comments made by McCaffery in July 2003; *"You are looking for a full liquor*

6   *license". (Ex. 8B pages 30, 31).* This is in reference to McCaffery asking Donovan on the

7   products he will be selling. Donovan indicated that he will not operate as a package store

8   and that he would offer corporate gifts that "could" include hard liquor, wine or beer.

9   Donovan was not going to limit the type of product he would sell. In the Bickford's case in

10  which the WLC conditioned their full liquor license – there is no record that McCaffery

11  questioned Bickford's on limiting there license.

12      The WLC, especially Wentworth/McCaffery, has thrown out an ever-changing series of

13  excuses for denying Donovan's applications. The "lack of public need" was not the reason

14  given in their prior rejections, it became their (Wentworth and McCaffery) last refuge when

15  all the other WLC's excuses failed, especially when zoning matter was resolved and when

16  MA Courts had jurisdiction over Donovan's "character". The above analysis demonstrates

17  that Wentworth and McCaffery decisions are a quintessential example of arbitrary and

18  capricious and abuse of discretion. It also demonstrates a reflection that Wentworth and

19  McCaffery don't like Donovan an they (Wentworth and McCaffery) will deny Donovan a

20  license at all cost, making Donovan jump every hurdle hoping he will go away, all in

21  retaliation of him (Donovan) and not limited to the following, PJD being a constant critic of

22  Woburn's political system, PJD filing suits against politicians and members of the WLC,

1    PJD reporting certain politicians to state and federal agencies for alleged illegal activities and

2    for undermining the WLC, Mayor and others etc.

### V. Specific Acts Donovan has Made Against City Officials

4    Please see Statement of Facts Sections and Exhibits.

### VI. WLC's July 2003 Decision Was Not Supported By Substantial Evidence

Donovan provided substantial evidence to the WLC that would support his operation.

The WLC only provided words from Wentworth and McCaffery. The WLC may find that such a

type of business is not in the best interests of the public and serve the public good but there must

be substantial evidence in the record to support its findings. Arthur v. Board of Registration in

Medicine, 383 Mass. 229, 418 N.E.2d 1236, 1236, 1241 (1981), Goodridge v. Director of

Employment Security, 375 Mass. 434, 377 N.E.2d 927, 929 (1978). "Substantial evidence"

means evidence as a reasonable mind might accept as adequate to support conclusion". Trustees

of Forbes Library v. Labor Relations Commissions, 384 Mass. 559, 428 N.E.2d 124, 130 (1981).

Substantial evidence, however, is more than just some evidence to support the conclusion of an

administrative agency. Cohen v. Board of registration in Pharmacy, 350 Mass. 246, 253, 214

N.E. 2d 63, 67-68 (1966). Furthermore, licensing boards are required to consider each

application on its merits and are not allowed to base their denial on a general policy that no

further licenses will be issued. See Turnpike Amusement Park, Inc. v. Licensing Commission,

343 Mass. 435, 179 N.E. 2d 322 (1962)(Court reversed local board's denial of license to operate

pinball machines based on a general policy not to issue any such licenses.)

The WLC based its decision on testimony from Paul Wentworth that he did a survey in

November 2001 and that his survey results indicated that Woburn has the highest ratio of

package store licenses per thousand people of population than all surrounding towns. (Exs. 8B

1   page 54, 8D). But Wentworth could not provide survey results in writing nor could he provide

2   names of the people he spoke to in regards to survey or the surrounding towns he did survey

3   with. This survey goes against the principals of <u>Ballerin, Inc. v. Licensing Board of Boston</u>, 49

4   Mass.App.Ct. 506 (2000) which commands that the public need test "includes assessment of

5   public want and appropriateness of a liquor license at a particular location" – not city wide as the

6   WLC claims and especially not data from other surrounding towns. See also <u>Fieldstone</u>

7   <u>Meadows Development Corp v. Conservation Commission of Andover</u> (MA Appeals Court 03-

8   P-517 – October 2004) in which the MA Appeals Court ruled that the Andover's decision was

9   arbitrary and capricious because the Conservation Commission used other guidelines not

10  provided in town's by-laws or any regulations promulgated thereunder. Wentworth's survey

11  method was never adopted by the majority of the WLC as a tool to determine public need or

12  want (Ex. 9H1 page 4 – Maguire testifies that "public need" is determined by MGL c. 138). It is

13  not listed in any of Woburn's by-laws or regulations as a method to determine public need or

14  want. And, most important it is not listed in MGL c. 138, s 15, s.15A or s. 23 as a method to

15  determined public need or want. Also, Wentworth conducted his survey after Donovan

16  presented to the WLC his survey indicating a public need at proposed location back in November

17  2001. In other words, Wentworth was out to prove Donovan wrong!

18      The WLC was also worried about delivery.

19      The WLC was also worried that PJD would sell license in future or relocate license. (Ex.

20  8B pages 50,51,75).

21      The WLC, however, do not cite, nor does the public hearing transcript's (Ex. 8B) include,

22  generalized evidence nor specific evidence that support such claims. "A mere speculation

23  concerning a matter of fact cannot form and adequate foundation for the … decision." <u>Blue</u>

1  Cross and Blue Shield of Massachusetts, Inc v. WLC Member of Insurance, 420 Mass. 707, 710,

2  652 N.E.2d 135 (1995).

3       The only two citizens' who spoke in opposition to PJD's application were Paul and Lori

4  Medieros (Ex. 8B pages 36-41, 9H, 9H5 page 2).  Both were sued in the RICO case file by

5  Donovan in 1998.  Mr. Medieros is the Woburn City Councilman who tried to ban this 8th license

6  in 1996 and failed. Medieros's proposed bill to ban 8th package store license was driven by the

7  politically connected package store owners in the city of Woburn to limit competition.  Donovan

8  exposed Paul Medieros in his RICO Complaint receiving monetary donations from these

9  package store owners in and around the time this bill was proposed.

10       PJD on the other hand, offered a comprehensive business plan, offered other material

11  information and offered oral presentation detailing the following; a brief historical overview on

12  his dealings with the WLC since 1995, gave an overview of his primary market, gave an

13  overview of his product to be sold, gave an overview of his internal policies regarding deliveries

14  and ID checking, gave an overview of hours of operation, gave an overview of his management

15  team and their experiences in the wine and spirits industry, gave an overview of the benefits  his

16  company would provide to the city of Woburn, gave an overview of the zoning settlement, gave

17  an overview of the criteria of issuing a liquor license pursuant to  MGL c. 138 s. 15, gave an

18  overview of the public need at proposed location and gave an overview of relevant case law

19  before the WLC and not limited to (Exs. 8B, 8E, 8H).

20       PJD does not present a case where its viewpoint merely differs from that of the WLC.

21  The WLC's viewpoint is unsupported by substantial evidence and, therefore, the WLC failed to

22  meets its statutory burden.

1    Notwithstanding the WLC's allowance of alcohol delivery by licensees (Ex. 8Q), a

2    Woburn City Council's 6-2 vote not to allow the WLC to prohibit the issuance of the eighth

3    license (Ex. 9E page 8), the WLC issuing said license in the 1960's (Exs. 12A, 12B, 12C) the

4    WLC issued said license to Donovan in 1995 (please note there has been minimal changes to

5    Donovan's original business plan from 1995, the only real change is from business/consumer

6    primary target market to just business as a primary target market) (Ex. 1A), a favorable decision

7    overriding the ABCC decision in 1999 from MA Courts (Ex. 2G), a Justice from MA Courts

8    suggesting that she would order this license issued once zoning was resolved (Ex. 7N page 61), a

9    recent ABCC ruling on point to PJD's matter (Ex. 8I), past support of over 150 taxpayers from

10   Woburn and past letters of support (Ex. 2C), two survey's conducted by Donovan to his primary

11   market both indicating a public need (Exs. 8F, 8G, 8K page1) and not limited to, the Court must

12   give weight to the discretionary authority conferred on the WLC by statue.  The discretion

13   lodged in the local authorities, however, is not unlimited.  Yerardi's v. Board of Selectman of

14   Randolph, 19 Mass.App.Ct. 296, 473 N.E.2d 1154, rev. den 394 Mass. 1103, 477 N.E.2d 595.

15   As stated above, insuring that the decision was made fairly and with the appearance of fairness is

16   a factor to be considered.  Board of Selectman of Barnstable, at 1017.

17   Furthermore, while the WLC offers no explanation for its reluctance to issue a license to

18   Donovan due to its concerns that delivery of alcohol would be to hard to control and the need of

19   mail order delivery business, it has allowed delivery licenses to other licensees, in particular,

20   Giles Market, Inc., John Doherty d/b/a Woburn Liquors, Doherty Brothers Market, Inc. and

21   Colonial Package Store (Ex. 8Q).

22   Furthermore, Wentworth's "public need" survey of November 30, 2001 which he

23   concluded that Woburn had the highest issued number of package store licensed issued per

1   population is clearly wrong. According to Annual Reports filed with the ABCC by Woburn and

2   surrounding towns and based on population census from US Census Bureau, the Town of

3   Burlington has the highest ratio of (5) licenses issued to a population of 22,876 or .0022 percent.

4   Woburn is at 7 licenses issued to a population of 37,258 or .0019 percent. The town of

5   Wilmington is at 4 licenses issued to a population of 21,963 or .0018 percent. (Exs. 8T, 8T1).

6       Furthermore, PJD made a good faith effort to relocate from 345 Washington Street to 30

7   Cedar Street to limit street exposure and walk-in business (Ex. 8A). While the WLC have

8   allowed other package stores to relocate to heavily traveled streets. For example, in June 2000,

9   they allowed S&L to relocate to Main Street from Salem Street. Although Salem Street is

10  heavily traveled, Main Street has much more traffic, with more street exposure than S&L's old

11  location. This was the same story with Giles Markets in 1995 when they moved from Montvale

12  Avenue to Cambridge Road.

13      Furthermore, Wentworth went on record in February 2003 before MA Court, saying that

14  his main focus in granting a new license or license transfer is new owner's years of experience in

15  the business. PJD's management team has over thirty years of direct experience in the wine and

16  spirits industry. The WLC never took this into consideration when making their decision (Ex.

17  8E page 9).

18      Furthermore, PJD is going hire six employees for his company with first job preferences

19  going to unemployed Woburn resident. Putting people back to work is a top priority of the

20  federal and state government. The WLC never took this into consideration when making their

21  decision. Their decision goes against state and federal policy (Ex. 8B page 15, 8E, page 10).

22      Furthermore, PJD has signed an agreement with city of Woburn that he would not have

23  refrigeration, would not sell nips or ½ pints, would not sell condiments, would have signage in

1  windows, would not advertise address in local papers etc. The WLC disregarded this zoning

2  agreement (Ex. 7Q, 7S).

3      Furthermore, PJD completed two surveys to his target primary target market and the

4  response was there is a public need for his type of service at proposed location. (Exs.8F, 8G, 8K

5  page 1). When PJD indicated to the WLC that he would do another survey to address "public

6  need" to his primary market under WLC's guidelines, they refused to take PJD up on his offer.

7  (Exs. 8C, 8B pages 59-60).

8      Furthermore, at least fourteen (14) MGL c. 138, section 12 licenses (hotel/restaurant on-

9  premise licenses) are located in the general vicinity on Woburn's Industrial Park. These

10  establishments are geared towards servicing the business people coming in and out of the park on

11  a daily basis (Ex. 8P). Not one Section 15 license (package store – off premise sales) is located

12  directly in the park, solely servicing the needs of these business people who come to this park

13  (Ex. 8O). The WLC did not take this into consideration when rendering their decision.

14      Furthermore, PJD would have the strictest ID checking policy in the city. No purchase

15  without proper ID regardless of age. All deliveries would have to be signed for by a person of

16  age with delivery log available for local and state authorities. The WLC did not take this into

17  consideration (Exs. 8E page 7, 8B page 10).

18      Furthermore, in January 2004 Wentworth and McCaffery both voted to allow Bickford's

19  Restaurant to have a full liquor license with the conditions (Ex. 13A pages 2, 3). Then in

20  December 2004 the WLC allowed another restaurant to have a full liquor license – Restorante II

21  Ducalli. Both McCaffery and Wentworth voted in favor to issue said license (Ex. 14A, page 2).

22      Furthermore in August 2002, Wentworth and McCaffery demanded that Donovan come

23  before the license commission to hear his May 2002 license application even though MA Courts

1    "stayed" license matter from being heard until Donovan resolved zoning matter (Exs. 7J, 7K).

2    The WLC's motive behind this meeting was to determine Donovan's "character" for an incident

3    Donovan had with Maguire's friend at Woburn Country Club (Exs, 7C, 7D, 7G, 7H, 7I, 7K, 7L,

4    7M, 7N, 7O, 7P).  The Woburn Police and the WLC never sought Donovan's side of the story,

5    nor did they speak to Donovan's witness on what happened in their investigation (Ex. 7I).  They

6    (Wentworth and McCaffery) only heard one side of the story – Maguire's friend and the Pub at

7    Woburn CC's side. Donovan knew Wentworth and McCaffery were going to blind side him at

8    this August 2002 meeting, so he did not attend.  Donovan reported the Pub at Woburn CC to the

9    ABCC for over serving alcohol undermining the WLC in regards to this incident. The Pub at

10   Woburn CC is a political hangout and Wentworth plays golf at Woburn CC at least five days per

11   week (Ex. 7G, 7H).  It is also alleged that Wentworth was acting on behalf of the Woburn Golf

12   and Ski Authority to "crucify" Donovan for him questioning the over serving of liquor at

13   Woburn CC and to protect their liquor license at all cost. Wentworth was going to use

14   Donovan's license application hearing as a trial and not go after Woburn CC for over serving of

15   alcohol who had the liquor license.  In February 2003, MA Courts took jurisdiction of

16   Donovan's character because they understood that the WLC/WPD investigation was one sided.

17        Furthermore in April 2001, the WLC (Wentworth, McCaffery and Maguire) reported

18   Donovan to the ABCC for him supposingly selling a liquor license that he did not have. Again,

19   the WLC was trying to get Donovan on something illegal so they could deny him on character.

20   The ABCC contacted Donovan and an old partner of his, Dan Bane regarding this matter.  This

21   matter was well documented in the local newspaper (Exs. 4A, 4B, 4C, 4D).

22        Furthermore, Wentworth and McCaffery went on record in May 2001 that they only

23   opposed PJD's license application because of zoning only (Ex. 5C, page 61). In fact, it was

- 26 -

1   Wentworth who sought another zoning opinion from building commissioner in May 2002 (Ex

2   5E, page 2). In addition since 1996, Wentworth's big issue "at public hearings" prior to July

3   2003 was zoning.  A more specific statement of reasons for Wentworth's and McCaffery'

4   reversal would "ensure administrative justice" and "encourage public confidence in the

5   administrative process." Dixie's Bar, Inc. v. Boston Licensing Board, 357 Mass. 699, 702, 259

6   N.E.2d 777, 779 (1970). Forsyth School for Dental Hygienists v. Board of Registration in

7   Dentistry, 404 Mass. 211, 217 (1982); V.S.H Realty, Inc. v. License Board of Worcester, 13

8   Mass.App.Ct. 586 (1982).

9                                **CONCLUSION**
10
11       Mr. Donovan and his management team for Corporate Wine and Gift are life long

12  residents of Woburn (Donovan now resides in Arlington) who have a combined 35 years

13  experience in the spirits industry (Ex. 8E page 9). By contrast, the combined experience of

14  Wentworth and McCaffery does not exceed 15years. Donovan's ten year effort to obtain an Off-

15  Premises All-Alcoholic license has been blocked at every turn by a license board determined to

16  not grant him a license regardless of whether he meets all of the requirements of MGL C. 138 s.

17  15. Donovan has repeatedly demonstrated that he does meet the requirements for approval of a

18  license under s. 15

19       The city of Woburn and members of the WLC (Wentworth and McCaffery) have allowed

20  package stores to expand and relocate without addressing public need etc.  They have allowed

21  new restaurants to obtain liquor licenses without addressing public need (please note: it is

22  common knowledge that most drinking and driving incidents occur from people driving after

23  leaving a bar or restaurant).   They have allowed restaurant liquor licenses to be conditioned.

24  They have allowed package stores to deliver product, without addressing their concerns about

1   delivering to underage drinkers etc. They have allowed direct competitors of Donovan to

2   operate within the same office park Donovan's proposed location – like the Chocolate Truffle,

3   Cookies by Design, Basket Builders, Edible Arrangements and other corporate gift companies.

4   All the while the WLC has consistently denied PJD this license on public need, zoning, delivery

5   etc.

6       PJD has alleged from day one, and not limited to the following that these constant denials

7   are all in retaliation with the intent to harm PJD for him filing suits against city officials, for him

8   being a constant critics on Woburn's political system and for him reporting certain city officials

9   to state and federal agencies etc. Before March 1995 when the WLC did issue said license to

10  PJD/BBWC, PJD was never a "public" critic of the political system in Woburn. The denials

11  started when PJD became a critic. See also <u>Board of County Commissioners, Wabaunese</u>

12  <u>County KS v. Umbehr</u>, 116 S. Ct. 2343 (1996) on Freedom of Speech.

13      Recognizing the existence of claims such as Donovan's is important. There are instances

14  when government officials seek to "get back" at a person or to retaliate for reasons that are

15  reprehensible and illegitimate but not related to the person's exercise of a protected right. In

16  such circumstances, no other federal claim will lie for the denial of equal treatment. The Equal

17  Protection Clause "has long been understood to provide a kind of last-ditch protection

18  governmental action wholly impossible to relate to legitimate governmental objectives." Esmail,

19  53 F. 3d at 180.

20      Similarly, irrational and vengeful discrimination against an individual may in reality be

21  class-based discrimination that is simply not immediately self-evident. The victim may, for

22  example, just happen to be the first member of a vulnerable group to suffer the discrimination

23  treatment. Or the person may be the applicant for a government job whose employment would

1    violate the silent quota limiting women or racial or ethnic minorities to existing numbers in the

2    workforce.  In either instance it might be difficult to plead or prove traditional class-based

3    animus but still be possible to show treatment that departs so dramatically from the norm as to

4    show, at the very least, personal vindictiveness that cries out to redress by federal courts.

5    In short, "if the power of government is brought to bear on a harmless individual merely because

6    a powerful state or local official harbors a malignant animosity toward him, the individual ought

7    to have a remedy in federal court." Id. At 179.

8        Just a reminder!  Going back to 1996, it was Wentworth (under watchful eye of

9    McCaffery in 2001, 2002 and 2003) who always raised the zoning issue.  Donovan proved them

10   wrong in May 2003 on zoning matter.  It was Wentworth (under watchful eye of McCaffery)

11   who had to complete a survey in November 2001 to undermine Donovan's survey he completed

12   in October 2001.  Donovan proved that their survey was clearly wrong.  It was Wentworth

13   (under watchful eyes of McCaffery) who questioned Donovan's character and tried to use it

14   against him.  Donovan proved them wrong by having MA Courts take jurisdiction over his

15   character because the court understood that the Woburn CC incident was one sided.  It was

16   Wentworth (under watchful eye of McCaffery) who brought up the delivery issue.  Donovan

17   proved them wrong showing other license holders had delivery licenses and who delivered to

18   residential addresses.  It was Wentworth (under watchful eyes of McCaffery) who brought up

19   that the agreed upon zoning conditions can't be enforced.  Donovan proved that conditions have

20   been used by other liquor license holders in the city of Woburn, proved that reasonable

21   conditions are recommended by the ABCC and proved that conditions are used by many cities

22   and towns across the Commonwealth.  As a last resort, Wentworth (under watchful eye of

23   McCaffery) brings up there is no public need.  Donovan proved that there is public need for his

1   business at proposed location and Donovan has shown other substantial evidence that supported

2   this need and the issuing of said license.  In August 2000 after license matter was remanded back

3   to WLC from MA Courts, Wentworth (under watchful eye of McCaffery) stated *"rather than go*

4   *through all of the above and possibly require Peter Donovan to commit to some sort of lease*

5   *requirement/cost, and we might criticized for causing him un-needed cost, that we go directly*

6   *back to ABCC/Judge Zobel and have them hear our side/opinions"*.  **(Ex. 2I, page 2)**  The MA

7   Courts heard the WLC's side of the story and they lost.  The above just demonstrates that the

8   WLC, especially Wentworth and McCaffery are out to get Donovan at all cost.  Enough is

9   Enough! Honest government matters and this court must send that message loud and clear!

10      For all of these reasons, this Honorable Court must issue a partial summary judgment in

11  Plaintiff's favor and enter any other order or award that justice may require.

March 23, 2005

Peter J. Donovan
35 Longmeadow Road
Arlington, MA 02474
781-643-2848

**CERTIFICATE OF SERVICE**

**I, PETER J DONOVAN, SERVED A COPY OF THIS MOTION And Supporting Documents
UPON THE DEFENDANT'S ATTORNEY VIA HAND DELIVERY ON MARCH 23, 2005.
SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY.**

**PETER J. DONOVAN**