UNITED STATES DISTRICT COURT
DISTRICT OF EASTERN MASSACHUSETTS

CASE NUMBER: 04-10614RWZ

PETER J. DONOVAN, pro se,  )
                          )
    Plaintiff             )
                          )
v.                        )
                          )
CITY OF WOBURN, et. al.   )
                          )
    Defendants            )
_____)

**PLAINTIFF'S "REVISED" BRIEF IN SUPPORT OF HIS MOTION FOR PARTIAL SUMMARY JUDGMENT**

**I. STATEMENT OF CASE**

The amended complaint is 22 pages long and contains 113 paragraphs and additional sub-paragraphs. The Statement of Undisputed Material Facts contains 49 paragraphs and additional sub-paragraphs. In addition, there are 155 Exhibits (Ex. hereafter) filed with this matter. The Plaintiff will try to simplify case as much as possible. Plaintiff, Peter J. Donovan, has been trying to obtain a liquor license in the city of Woburn since March 1995. In March 1995 the WLC issued a license to PJD *"indicating that it was the best presentation they have seen in eleven years" (Maguire's comments)* under his corporation The Boston Beer and Wine Company, Inc. with the condition that he does not sell hard liquor. In June 1995, the WLC revoted to deny license to Donovan on a 1 to 1 vote (Maguire for, Galante against) because they (WLC) could not enforce the condition. PJD appealed this June 1995 decision to the ABCC and they (ABCC) rejected the appeal indicating that Woburn did not have a beer and wine license.

The June 1995 WLC denial was very troubling to Donovan because Galante's family had two competing applications on file with the WLC for said 8th package store license. In addition,

1    her (Galante) brother-in-law was the only person to oppose Donovan from getting 8th package

2    store license in March 1995. According to Ed Donohoe in a conversation with WLC Chairman

3    Dennis Donovan, *"Galante's family was giving her all kinds of grief because she voted to issue*

4    *license in March"* (Ex. 9E, page 10 answer #8). In and around October 1995, because of what

5    transpired with Galante's conflict of interest, the WLC revoting to deny Donovan license and

6    other matters, Donovan started speaking out, filing lawsuits, writing letters to the editor, etc

7    against Galante (Exs. 2B, 11B), the WLC, the mayor and other political officials. Below are a

8    few examples of Donovan's campaigns against city officials; **1.)** PJD filed suit against members

9    of the WLC and the Mayor in January 1996 focusing on getting Galante removed from voting on

10   this 8th package store license because her family wanted said license and other laws the WLC

11   were violating (Exs. 9B, 9B1, 9B2). **2.)** It is alleged that Donovan's campaign help get his

12   father, Dennis Donovan, removed from the WLC in May 1996 (Ex. 10D). It is also alleged that

13   Donovan's campaign helped get Galante removed from WLC in February 1997. To this day,

14   certain politicians dislike PJD for what he did to his father and Galante (Exs. 10A, 10C and 10E).

15   In May 2002 this dislike was quite apparent in a case before MA. Courts. All city solicitor

16   Thomas Lawton did when questioning PJD was focus on what transpired between PJD and his

17   father. Wentworth was present during this questioning. **3.)** In 1997 Donovan filed a complaint

18   with District Attorney regarding WLC violating open meeting laws – DA ruled against WLC on

19   this matter (Exs. 9G, 9G1, 9G2). **4.)** In 1997, Donovan questioned the Mayor's new

20   appointment (McCaffery) to the WLC – this matter forced Maguire to re-register his political

21   party affiliation as a Republican in order for him to remain on the WLC (Ex. 9C). **5.)** In 1998

22   Donovan filed a suit in Federal Court under RICO and other violations against Wentworth and

23   other politicians and local politically connected package store owners (Exs. 9H, 9H1, 9H2, 9H3,

1   remanded Donovan's license appeal back to city after it ruled that the WLC decision was

2   arbitrary and capricious (Ex. 2G and 2H).

3       Since matter was remanded back to city in June 2000, the WLC have always contended

4   that PJD's proposed location was illegally zoned and would not hold a public hearing on PJD's

5   application. The WLC sought zoning opinions from the city solicitor and the building

6   commissioner not knowing all the relevant facts regarding PJD amended business plan, nor the

7   information needed to seek said opinion.  This zoning matter went back and forth over a three

8   year period and in May 2003 the zoning matter was finally resolved between the City of Woburn

9   and PJD and approved by MA Courts.

10      On July 31, 2003, the WLC finally held a hearing on Donovan's license application after

11  the zoning issue and character issue were resolved (Ex. 8B).  The WLC again rejected the

12  application stating "no public need" existed for another package store license to be issued in the

13  city of Woburn and other issues.  On August 28, 2003, PJD filed an appeal pursuant to G.L. c.

14  249, s.4 in MA Courts seeking relief in the nature of certiorari (Ex. 8J, 8K, 8L, 8M, 8N).  In

15  March 2004, PJD filed a complaint in Federal Court alleging that the WLC violated his 14th

16  Amendment Rights to Equal Protection and other federal violations.

17      The WLC's decision dated August 5, 2003 (Ex. 8D) rejecting PJD's application for a

18  package store license must be vacated for the following reason: (i) the WLC denial lie in the

19  basis of a trivial or trumped-up "public need" claim and other frivolous claims not to issue said

20  license to Donovan because they don't like him, while "maintaining a policy and practice of

21  routinely granting new licenses with conditions or without conditions, renewing existing package

22  store licenses that have attached delivery licenses, allowing other package store license holders

23  to relocate and expand, allowing other gift type companies to operate in the same office park etc.

- 4 -

1  for the sole and exclusive purpose of exacting retaliation and vengeance against" Donovan for

2  him being a critic of Woburn's political system, undermining public officials and other issues

3  listed in statement of facts - thus denying Donovan his Right to Equal Protection.

4  ## II. ARGUMENT

5  **A. Exhausting of Administrative Remedies:**
6
7  Donovan has exhausted his administrative state remedies under state law and is waiting

8  on Massachusetts Court of Appeals to render a decision on said matter (Ex. 8N).  Donovan could

9  not find any case law indicating that he cannot pursue a federal claim under Equal Protection at

10  the same time a state case is pending on different claims.

11
12  **B. WLC's Decision dated August 5, 2003 Violated Plaintiff's Equal Protection Rights as an**
13  **Individual Pursuant to the 14th Amendment to the US Constitution:**
14

15  The Equal Protection Clause states "nor shall any State...deny to any person within its

16  jurisdiction the equal protection of the laws." (U.S. Const. Amend XIV, s1).  Mr. Donovan asks

17  this court to enforce and protect his right to be treated fairly as others have been who have been

18  in the same situation as Donovan without being retaliated against by city officials (Wentworth

19  and McCaffery) for him, and not limited to the following, undermining them, filing suits against

20  them, reporting them to state and federal authorities for illegal activity, openly criticizing them

21  etc.

22  The Supreme Court has "recognized successful equal protection claims brought by a

23  "class of one, where the plaintiff alleges that (he) has been intentionally treated differently from

24  others similarly situated and that there is no rational basis for the difference in treatment. "

25  Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2001).

1          An individual also may state a claim under Equal Protection if he can show that state

2    government took an action that "was a spiteful effort to "get him for reasons wholly unrelated to

3    any legitimate state objective." Esmail v. MaCrane, 53 f. 3d 176, 180 (7th Cir. 1995). The Equal

4    Protection Clause provides a remedy when a powerful public official pick(s) on a person out of

5    "sheer vindictiveness." Id. At 178. This type of discrimination has been characterized as the

6    creation of a "class of one." Indiana State Teachers Ass'n v. Board of Sch. Comm'rs, 101 F. 3d

7    1179, 1181-82 (7th Cir. 1996). To prevail, the plaintiff must demonstrate that the government is

8    treating unecually those individuals who are prima facie identical in all relevant respects, see id.,

9    and that the cause of the differential treatment is "totally illegitimate animus toward the plaintiff

10    by the defendant." Olech v. Willowbrook, 160 F.3d 386, 388 (7th Cir. 1998), aff'd on other

11    grounds, 528 U.S. at 565. If the "defendant would have taken the complained-of action anyway,

12    even if it didn't have the animus, the animus would not condemn the action." Id. Ill will must

13    be the sole cause of the complained-of action." See id. A showing of "uneven law

14    enforcement " standing alone, will not suffice. Id.

15          In addition, many lower federal courts have recognized that the Equal Protection Clause

16    is violated when a state purposely discriminates against a "class of one." One of the first such

17    decisions was authored by the eminent jurist, Learned Hand, in Burt v. City of New York, 156

18    F.2d 791 (2d Cir. 1946), a case in which an architect alleged that building officials of the City of

19    New York intentionally treated him differently from all other architects as a result of "personal

20    hostility." (156 F.2d 791, 791.) Judge Hand considered the complaint to allege adequately the

21    denial of equal protection of the laws, and Judge Hand considered that this Court's decision in

22    Snowden v. Hughes, 321 U.S. 1 (1944), "definitely settled it, that, if a complaint charges a state

23    officer, not only with deliberately misinterpreting a statute against the plaintiff, but also with

1   purposely singling out him alone for that misinterpretation, it is good against demurrer." (156

2   F.2D791, 792.) See also LeClair v Saunders, 627 F.2d 606, 609-610 (2d Cir. 1980), cert denied,

3   450 U.S. 959 (1981); Zeigler v Jackson, 638 F.2d 776, 779 (5th Cir. 1981); Ciechon v City of

4   Chicago, 686 F.2d 511, 522 (7th Cir. 1982); Yerardi's Moody Street Restaurant & Lounge, Inc.

5   v. Board of Selectmen, 878 F.2d 16, 21 (1st Cir. 1989); Rubinovitz v. Rogato, 60 F.3d 906, 911-

6   912 (1st Cir. 1995); Esmail v. Macrane, 53 F.3d 176, 179-180 (7th Cir. 1995).

7         In cases of this nature, the Appeals Court has stated that it must *"consider whether there*

8   *is cause to believe that the agency, by gross illogic, has arbitrarily singled out an individual for*

9   *unequal and perhaps invidious treatment"* Yerardi's Moody St. Restaurant and Lounge, Inc., 19

10  Mass. App. Ct. at 301.  It also stated that *"it would offend equal protection to refuse licenses to*

11  *one group when others obtained licenses in similar circumstances. Id., 19 Mass. App. Ct. at 303,*

12  *n.9.  "A plaintiff can allege an equal protection violation by asserting that state action was*

13  *motivated solely by a "spiteful effort to get" him wholly unrelated to any legitimate state*

14  *objective ".* Esmail v. Macrane, 53F.3d 176 (C.A. 7 1995*).   "The purpose of the equal*

15  *protection clause of the Fourteenth Amendment is to secure every person within a state's*

16  *jurisdiction against intentional and arbitrary discrimination, whether occasioned by express*

17  *terms of a statute or by its improper execution through duly constituted agents".*

18        Donovan is a victim, just as much as members of other unpopular groups, of differential

19  treatment at the hands of a governmental actor for reasons patiently offensive to traditional

20  notions of fairness and justice.  The Equal Protection Clause exists to protect citizens from

21  precisely such improperly motivated governmental action.  Differential treatment in government

22  action motivated by the desire to punish one based on personal animus should not be

23  countenanced any more than race or sex-based discrimination when it comes to the Equal

- 7 -

1    Protection Clause.  Indeed, one wonders why government – at least, good government would

2    want to argue otherwise.  "If the power of government is brought to bear on a harmless

3    individual merely because a powerful state or local official harbors a malignant animosity toward

4    him, the individual should have remedy in federal court'.  <u>Esmail v. Macrane</u>, 53 F. 3d 176, 179

5    (7th Cir. 1995).  See also <u>Yick Wo v. Hopkins</u>, 118 U.S. 356, 369-70 (1886) ("When we consider

6    the nature and theory of our institutions of government, the principles upon which they are

7    supposed to rest, and review the history of their development, we are constrained to conclude

8    that they do not mean to leave room for the play and action of purely personal and arbitrary

9    power.")  Here the Defendants injured Donovan by treating him differently and denied him said

10   license because they did not like him, which created the same practical harm as if they had

11   denied him the license because he is Irish.  But the Equal Protection Clause "state(s) a

12   commitment to the law's neutrality where the rights of persons are at stake." <u>Romer</u>, 517 U.S. at

13   623.

14        Moreover, the human experiences tell us that one need not to be a member of a suspect

15   class (or any of typical class) to be politically disfavored or singled out for unfair treatment.

16   Indeed, governmental action that burdens only a few persons may require special scrutiny

17   because it likely carries fewer political consequences.  *"Classifications should be scrutinized*

18   *more carefully the smaller and more vulnerable the class is.  A class of one is likely to be the*

19   *most vulnerable of all"*…. <u>Esmail</u>, 53 F. 3d at 180.  As this Court has recognized, "a status-based

20   (governmental action) divorced from any factual context from which (the Court can) discern a

21   relationship to legitimate state interests…is a classification of persons undertaken for its own

22   sake, something the Equal Protection Clause does not permit." <u>Romer</u>, 517 U.S. at 635.

23

### III. The "Similarly Situated" Standard:

The determination as to whether individuals are "similarly situated" for equal protection purposes is an amorphous one. See <u>Barrington Cove</u>, 246 F.3d at 8. "' The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. Much as in a lawyer's art of distinguishing cases, the "relevant aspects" are those factual elements which determine whether reasoned analogy supports, or demands, a like result. Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.'" <u>Id.</u> (citation omitted). See also <u>Tapalian v. Tusino</u>, 02-1732 (1st US District Court).


### A.  **Current Package Stores in Woburn Compared to Donovan:**


1. **Expansion and Relocation:** On March 11, 1976, the WLC approved Martignetti's relocation and expansion from 354 Cambridge Road (1,700 square feet) to 368 Cambridge Street (12,000 square feet). This relocation and expansion never went through because package store owners of Woburn put an injunction on license from being relocated. Martignetti had to return license to city in 1978 (Ex. 12C pages 4 and 6). This is the 8th license that Donovan is applying for.

2. **Expansion and Relocation:** In August 1995, the WLC allowed Giles Liquor to relocate and expand to the Westside of Woburn without scrutinizing them on public need. The expansion was from 500 sf. to 1,700 sf.. Please note: Giles Liquor is owned by the family of Woburn City Councilman, Scott Galvin. (Exs. 8R, 8E page 14).

1    3. **Expansion and Relocation:**  In 1997, the WLC allowed Giles Liquor to relocate and expand

2       again from 1,700 sf. to 5,100 sf. without scrutinizing them on public need. (Exs. 8R, 8L, 8E

3       page 14).  Wentworth and McCaffery voted in favor of this expansion.

4    4. **Expansion and Relocation:**  In June 2000, the WLC allowed S&L Liquors to expand and

5       relocate from 2,000 sf. to 4,200 sf. without scrutinizing them on public need. (Exs. 8S, 8L, 8E

6       page 14).  Wentworth and McCaffery voted in favor of this expansion.

7            The above license holders all have MGL c. 138 s. 15 licenses (off-premise liquor

8    licenses).  MGL c. 138, s. 16A states;

9            License issued under section twelve (on-premise - restaurant) or fifteen (off-
10           premise – package store) be automatically renewed for the next annual
11           license period upon application by the holder thereof during the month of
12           November and shall be automatically renewed for a renewal of a seasonal
13           license for the next seasonal license period upon application during the
14           month prior to the commencement of the seasonal period upon payment of
15           the fee, provided that said license is of the same type as the expiring license
16           and covers the same licensed premises.  If the application does not meet the
17           conditions hereunder, it shall be treated as an application for a new license
18           and all the procedures set forth under Fifteen A shall be applicable thereto.
19

20           The WLC allowed other package store owners to expand and relocate without addressing

21   their changed applications as a new license application, thus not addressing public need, traffic,

22   proximity to schools or churches violating state law.  Donovan had a new license application and

23   the WLC denies him on "Public Need" and other frivolous claims while allowing these other

24   stores to expand and relocate. In an affidavit filed in the MA Appeals Case, Wentworth states

25   *"that public need was addressed when these licenses were first issued and did not need to be*

26   *addressed again"* (Ex. 8L ).  In addition, Wentworth stated in July 2003 regarding above

27   expansion (Ex. 8B, page 57), *"The liquor industry in my mind has changed dramatically.  Before*

28   *you either__you went in and ordered whiskey, rye or beer.  Now there's all sorts of wines.  We*

1    *have_they (meaning package store owners) have a right to be able to properly display their*

2    *wares. And that's one of the main reasons that we allowed it".*  This is so far from what a

3    reasonable business person would conclude.  It would be economic suicide for a retailer to

4    "substantially" expand their business without having a need for said expansion.  The package

5    stores above have doubled and tripled in size (Giles and S&L).  The average retail rent per

6    square foot in Woburn is $25 per square feet.  In 1997, Giles expanded from 1,700 sf to 5,100

7    sf..  This increase in space would increase Giles rent by $85,000 per year (5,100 sf minus 1,700

8    sf = 3,400 x $25 per sf = $85,000 per year).  No reasonable business owner is going to incur an

9    increase in rent of $85,000 per year just to display product as Wentworth suggest!  Also if that

10   were the case as Wentworth suggest, why aren't other package stores expanding to display their

11   product?

12          On March 10, 2005 before MA Court of Appeals Oral Arguments – the defendant's

13   suggested that the city of Woburn has seven wards throughout the city and they have a package

14   store in each ward and that is enough to satisfy public need.  If this court reviews Ex. 8O, the

15   map of Woburn, they will see that there is no package store located in the northeast corner of the

16   city, which happens to be the busiest section of the city during the work week.  In fact, the

17   closest package store to Donovan's proposed location is at least two miles away (this mileage

18   distance includes package stores in Reading and Stoneham).  The defendants know this and it is

19   common knowledge throughout the city.  MGL c. 138 dictates that the number of licenses issued

20   per city or town is based on that city or town's population, not the number of wards a city or

21   town has.  This is a clear violation of MGL.

22          Wentworth's assessment of the industry is not even half true.  Wine is a big factor in the

23   retail industry today.  But so are high end vodkas and scotches.  In addition, in and around

- 11 -

1    1994/1995 home delivery of wines brought another big change to the industry as well.  In 1993,

2    Geerlings and Wade of Canton, MA was one of the pioneers in the home/business wine delivery

3    market and is one of the largest wine delivery companies in the United States today.  See their

4    website (www.geerwade.com).  GW has a typical "retail" package store license issued by the

5    town of Canton, MA (Ex. 17D).

6        Currently before the United States Supreme Court is <u>Michigan Beer & Wine Wholesalers</u>

7    <u>v. Eleanor Heald et.al</u>  Docket 03-1120.  This case is an equal protection case that involves direct

8    shipments from manufacturer (winery) to consumer.  If the US Supreme Court rules in favor of

9    Heald et al, this will basically cut out the wholesaler and retailer altogether at the state level.  An

10   opinion in this matter should come down from the US Supreme Court in the next 60 days.  This

11   case will have a dramatic effect on the liquor industry across the US as we know it today.

12

13   5. **Delivery Licenses:**  other package stores in the city of Woburn have been delivering product

14      within the city for years to residential addresses with no delivery schedules or restrictions (Ex.

15      8Q, ).  But McCaffery and Wentworth, deny Donovan on his license application on delivery

16      and because his (Donovan's) focus is on delivery to business addresses only with a limited

17      delivery schedule from Monday through Thursday up to 3PM.  Plus all deliveries have to be

18      signed for by a person of age.  (Ex. 8B, page 12).

19

20   6. **Zoning – McDonough v. WLC in 1992:**  In 1992, the WLC denied Kevin McDonough on

21      public need for the same license that is question before this court (Exs. 15A, 15B, 15C).  The

22      WLC determined that McDonough's proposed location was allowed by right (800 Cummings

23      Park – 320 Washington Street) (Exs. 15C page 7, 3D).  McDonough's proposed location was

1    located in the same office park as Donovan's proposed locations that he (Donovan) presented

2    to the WLC in 2001, 2002 and 2003.  The WLC never sought zoning opinions from city

3    solicitor or the building commissioner in the McDonough matter!

4         It is common knowledge that Donovan's proposed locations have been used for retail for

5    years going back before 1995. (Exs. 3A, 3B, 3C, 3D, 3F, 3G, 3H, 3I, 3J, 3K, 3L, 3M, 3N).

6    Wentworth and McCaffery know this and so does every one who is familiar with this side of

7    the city.

8         In March 1995 when the WLC did issue Donovan the license – zoning was never an issue

9    before them.  In fact, the Building Commissioner issued an occupancy permit to Donovan

10   (Exs. 1C, 1D).

11   **B. Other Factors and Comparisons**:

12   1. **Delay Tactics - ZONING:**  The WLC (especially Wentworth under the watchful eye of

13   McCaffery) sought zoning opinions from city solicitor and building commissioner denying

14   Donovan space at proposed locations (325 Washington Street, 30 Cedar Street and 345

15   Washington Street)- (Exs. 5B, 6D, 7A, 7B) while having common knowledge that retail had

16   been allowed at Donovan's proposed locations for years and even knowing that they (WLC)

17   determined that McDonough could operate a full liquor store at said location without

18   conditions back in 1992.

19        All along, the city has allowed retail at Donovan's proposed locations.  These denials

20   caused Donovan to lose proposed space and have him reapply for license again and again

21   because his proposed space became occupied by another retailer.  The WLC made Donovan

22   catch a moving target by seeking these zoning opinions!  That is why the May 2003 zoning

1   settlement/agreement includes three property locations so this moving target will be

2   eliminated. (Exs. 7Q, 7R, 7S, 7T).

3       In May 2001 – the WLC seek zoning opinion from city solicitor for 325 Washington

4   Street (Ex. 5B). This location has a special permit to operate as a convenient/retail store. The

5   city solicitor drafts a memo to deny zoning. The WLC denies license to Donovan based on

6   public need (Maguire only) and zoning only (Maguire, Wentworth, McCaffery) (Ex. 5C pages

7   60, 61).

8       In November 2001 – the WLC seek another zoning opinion from Building Commissioner

9   (BC hereafter) for 345 Washington Street and BC denies Donovan his proposed space based on

10  there is no retail allowed at said location (Ex. 6D).   In February 2002, Rainbow Inc. moves to

11  exact location and unit as Donovan's proposed location.  Rainbow retails jungle gyms (Exs.

12  3A, 3M, 3M1). This caused Donovan to seek another location. Also in October 2002, Just

13  Kidding! A Toy Store was allowed to occupy space at 345 Washington by the city of Woburn.

14  A toy store!  (Ex.3L).

15      In May 2002, according to the Middlesex District Attorney office it was Wentworth

16  (WLC) who sought zoning opinion from BC for 30 Cedar Street - (Exs.7A, 7B, 7E page 2).

17  Again, BC denies Donovan's location based on there is no retail allowed at said location.  In

18  2003, Edible Arrangements moves into 30 Cedar Street. Edible is a gift store like Donovan has

19  proposed – (Ex. 7E). This zoning opinion was appealed to MA Courts by Donovan and was

20  settled in May 2003. (Exs. 7Q, 7R, 7S, 7T).

21      Other gift stores offering the same type of corporate gifts Donovan has proposed are as

22  follows: Chocolate Truffle located at 200 Cummings Park has been at same location since mid

23  1990's (Ex. 3G).  Basket Builders located 400 Cummings Park moved to said location in 2004

1   (Ex. 3F). Cookies By Design located at 8 Cummings Park (345 Washington Street) has been at

2   said location since 2003 (Ex. 3H). These stores offer corporate gifts focusing on the same

3   business market in the same area as Donovan proposed. All of these stores are in the same

4   office park as Donovan's proposed location. Other retailers that operated in same office park

5   over the years include; Hancock Paint, Party Works, Corporate Convenient Store, Woodworker

6   Warehouse, Picture Works, Direct Connect – Wireless Superstore, Active-Electronic

7   Component Depot, Alfa Computer etc (Exs. 3G, 3I, 3J, 3K). Plus the owner of the property

8   has advertised in the Boston Globe available retail space at these locations and advertises retail

9   space along Washington Street adjacent to properties in question - (Exs. 3B, 3C). Please note:

10   all exterior signs in the city of Woburn have to be approved and permitted by the BC.

11        Another type of store that mail orders beer and wine type product is Beer and Wine

12   Hobby Shop located at 155 New Boston Street, Woburn, MA. This store mail orders beer and

13   wine making kits and has walk in retail. This store has operated in the city for over 15 years

14   with no scrutiny from BC or city officials about retail use in an Industrial Park zoned location

15   (Ex. 3N).

16        The WLC sought these zoning opinions forcing Donovan to appeal BC's decisions all the

17   way up through MA. Courts. These sought after zoning opinions by the WLC were in

18   violation of case law and under the watchful eye of the city solicitor, the mayor and other city

19   officials. See Bradshaw v. Board of Appeals of Sudbury, 346 Mass. 558, 194 N.E.2d 716

20   (1963). In Bradshaw;

21            "It is not, however, within the jurisdiction of the licensing authority to pass on
22            zoning questions, nor within the jurisdiction of the zoning board to pass on the
23            propriety of the issuance of a liquor license".
24

1      Up until said zoning settlement in May 2003 between the city of Woburn and Donovan,

2      the above type gift stores thrived and flourished at the same locations as Donovan proposed.

3

4      **2. Other Delay Tactics:**   From 1992 to 2003 the WLC have denied all applicants the 8th

5      package store license on "public need" forcing these applicants, including the plaintiff, to

6      appeal said denials up through MA Courts – thus delaying the issuing of license. Public need is

7      the most used excuse to deny a license in the Commonwealth, because it is open to legal

8      interpretation.   In McDonough's and Donovan's cases, both had large public support to issue

9      license and really no public opposition. In McDonough's case, Mayor Rabbit indicated to Ed

10     Donohoe (Donovan's attorney at the time) *"that it wouldn't look right if McDonough received*

11     *the license because he was president of the city council"* (Ex. 9E page 10).   It is alleged that

12     these denials were in retaliation of applicants reporting sitting mayors to state agency for

13     corruption (McDonough reporting Rabbitt) and retaliation for suing sitting mayors and WLC

14     members in court and critizing local politicians (Donovan on WLC, Rabbitt , Dever and

15     Curran).

16         The city solicitor was very critical of the WLC in the Covino matter in August 1994 for

17     not hearing their license application (Ex. 16A). Also, see Attorney Ed Donohoe's comments in

18     January 1995 when Donovan was applying for this license – Chairman of the WLC was telling

19     Donohoe *"it was not a good time to apply for this license, wait until May"* (Ex. 9E page 9

20     *answer #5)*.   Then sometime in 1994/1995, the former chairman of the Woburn License

21     Commission, Dennis Donovan, drafted the following notes regarding this last package store

22     license (Ex. 16B);

23

24         *"Delaying Tactic – New Mayor maybe next year.  Will hold up as much as possible".*

1

2      The above delay tactics are perfect examples of how political officials can abuse the

3      system if they don't like you or don't want you to have something.

4

5      **3. Conditions:**  The WLC has allowed Bickford's Restaurant to put nine conditions on their

6      full liquor license without scrutinizing them on said conditions (Ex. 13A, page 2 and 3).  One

7      condition on Bickford's license was to serve beer and wine only.  In 1995, the city solicitor and

8      WLC (Galante) made a big fuss about Donovan putting a beer and wine condition on a full

9      liquor license when the WLC issued license to Donovan in March 1995 (Ex. 1A, 1B, 9B2 page

10     2 #5).  The city solicitor raised the issue of <u>Hub Nautical Supply Co., Inc. v. ABCC</u>, 422

11     NE2nd 1065.  The WLC and city solicitor never mentioned Hub Nautical case in regards to

12     Bickford's conditions (Ex.13A).

13             Furthermore, Wentworth and McCaffery scrutinized Donovan on his conditions after the

14     city of Woburn and BC agreed to said conditions.  These conditions were to comply with

15     zoning.  It is common knowledge throughout the Commonwealth, liquor licenses/zoning are

16     conditioned for many purposes and Wentworth and McCaffery were well aware of these

17     issues.  See <u>Building Department for the City of Beverly decision dated August 8, 1996</u>

18     (granting conditional license to Boston Beer and Wine), <u>Town of Canton, Board of Appeals</u>

19     <u>decision dated September 28, 1995</u> (granting conditional license to Geerlings and Wade, Inc.),

20     <u>ABCC decision regarding Finast Liquors of Massachusetts dba Edwards Food Warehouse</u>

21     <u>dated March 25, 1992</u> (recommending city of Chicopee to issue package license with

22     reasonable conditions as it may deem in the public interest) and <u>ABCC decision regarding</u>

23     <u>Candido and Monserrate Fernandez dba Holyoke Mini Market October 27, 1993</u>

1    (recommendation that the application be granted with reasonable conditions including the

2    condition that beer not be sold in single bottles or cans.). Most important, see <u>WLC regarding</u>

3    <u>Bickford's Restaurant</u>(WLC conditioning full liquor license file dated January 2004) -(Exs.

4    17A, 17B, 17C, 17D, 13A page 2 and 3).

5    **4. Blanket Policy:** In 1999, the State Court's decision was very critical on WLC's decision on

6    said license and indicated that having a "Blanket Policy" on said license is arbitrary and

7    capricious (Ex. 2G). Since 1992, the WLC have seen and heard every possible business type

8    for said license. In 1992, McDonough proposed a full package store. WLC denied

9    McDonough on public need (15A, 15B, 15C). In 1995, 1996, 1997, 2001 and 2003 Donovan

10   proposed a mail order and corporate gift type business. WLC denied Donovan on public need

11   and other issues. It is alleged that the WLC is protecting this license for someone as a political

12   pay off or they are protecting certain package store owners from competition by not issuing

13   license. The blanket policy remains on this last package store license and the WLC is treating

14   each applicant for said license much differently than others who apply for other types of liquor

15   licenses or other package store owners who have existing licenses.

16
17   **IV. Analysis of Wentworth's and McCaffery's Voting Patterns in regards to Donovan's**
18   **License Applications from June 1996 to July 2003**
19
20   **A. Wentworth:**

21   1. In June 1996, Wentworth voted to deny license as follows; "*The reason for denial is*

22   *based on fact that retail sales are not allowed in I-P zone, and would require approval of*

23   *Building Commissioner, and that has not been requested*". Please note this was the first time

24   Wentworth voted on any license – he just became a member of the WLC in May 1996 (Ex. 2A

25   page 2).

1       2. In February 1997, after ABCC remanded matter back to Woburn for further review

2    Wentworth adds the following to his denial (Ex. 2F page 2, 3);

3       - *Retail sales are not allowed in an I-P zoned area, concurrence for exceptions to*

4          *that ordinance would require approval from the Building Commissioner, and that*

5          *was not requested by Mr. Donovan for that proposed address.*

6       - *Law 138, sec 15 states: "Any sale of such beverages shall be conclusively*

7          *presumed to have been made in the store wherein the order was received from*

8          *customer". Based on that statement, I did not believe that we had the authority to*

9          *grant a mail order/delivery sales license under sec. 15. I don't feel that the best*

10        *interests of the City are served by mail order/delivery sales, due to concerns such*

11        *as proof of intoxication or proof of age.*

12   *3.*   In an Interrogatory dated 2/18/2000 – Wentworth states the following; *"I cannot in good*

13   *conscience, state that plaintiff (Donovan) is of good character"* (Ex 9H2 page 1). Character is

14   one criteria on issuing a license under MGL c. 138 s. 15. Wentworth would never bring this up

15   at a public hearing because he knows he would be sued for defamation – this is a perfect

16   example showing Wentworth dislikes Donovan. Also in this Interrogatory - in reference to

17   editorials written by Donovan and newspapers articles regarding Donovan and his company;

18   Wentworth states: *"Some articles certainly didn't speak well to good character. "*  And *"Yes*

19   *I never heard anyone defend them"* (Ex. 9H2 page 3). Meaning that people were talking

20   negative to Wentworth about these news articles.

21   *4.*   In June 2001, Wentworth denies Donovan license as follows (Ex. 5C page 61):

22          *" I'm opposed to the issuance of the license because no one authority or this*
23          *licensing board has the authority to bypass or ignore zoning requirements.*

*This is an O-P zone. It is against the ordinance and also, as stated before, this required a special permit from the City Council and we had no right to change that without their proper authority. Therefore, I'm opposed to issuance of the license"*

5.    In July 2003, Wentworth denies Donovan license on "public need" and other frivolous issues (Ex. 8D).

**B. McCaffery**

**1.** In June 2001, McCaffery denies Donovan license as follows: (Please note this was McCaffery's first time voting on Donovan's application.) (Ex. 5C page 61).

*"The reason I'm opposed to it is because the letter here states in other words the local licensing authority has no jurisdiction whatsoever to override or circumvent zoning regulations through the exercise of its discretion.*

*I vote against it."*

2.    In July 2003, McCaffery denies Donovan license on public need and other frivolous issues (Ex. 8D).

3.    Other comments made by McCaffery in July 2003; *"that it was his personal opinion (emphasis added) that we've got several liquor package stores here now. We have all kinds of licenses, restaurants, and there's enough liquor in Woburn." (Ex. 8B page 31)* But, he has voted in favor to allow Bickford's to obtain a liquor license with conditions in December 2003 and voted in favor to allow Restorante II Ducalli to obtain a liquor license in December 2004 (Exs. 13A, 14A).

4.    Other comments made by McCaffery in July 2003; *"You are looking for a full liquor license". (Ex. 8B pages 30, 31).* This is in reference to McCaffery asking Donovan on the products he will be selling. Donovan indicated that he will not operate as a package store and that he would offer corporate gifts that "could" include hard liquor, wine or beer. Donovan

1   was not going to limit the type of product he would sell. But, Donovan will limit on how he

2   sells his product (see zoning conditions).   In the Bickford's case in which the WLC

3   conditioned their full liquor license – there is no record that McCaffery questioned Bickford's

4   on limiting their license.

5       The WLC, especially Wentworth/McCaffery, has thrown out an ever-changing series of

6   excuses for denying Donovan's applications.  The "lack of public need" was not the reason

7   given in their prior rejections, it became their (Wentworth and McCaffery) last refuge when all

8   the other WLC's excuses failed, especially when zoning matter was resolved and when MA

9   Courts had jurisdiction over Donovan's "character".  The above analysis demonstrates that

10  Wentworth and McCaffery decisions are a quintessential example of arbitrary and capricious

11  and abuse of discretion.  It also demonstrates a reflection that Wentworth and McCaffery don't

12  like Donovan and they (Wentworth and McCaffery) will deny Donovan this 8th package store

13  license at all cost, making Donovan jump every hurdle hoping he will go away, all in

14  retaliation of him (Donovan) and not limited to the following, PJD undermining them, PJD

15  being a critic of Woburn's political system, PJD filing suits against politicians and members of

16  the WLC, PJD reporting certain politicians to state and federal agencies for alleged illegal

17  activities etc..

18              **V. Specific Acts Donovan has Made Against City Officials**

19      Please see Statement of Facts Sections and Exhibits.

20
21   **VI. WLC's July 2003 Decision Was Not Supported By Substantial Evidence**
22
23      Donovan provided substantial evidence to the WLC that would support the issuing of 8th

24  liquor license.  The WLC only provided words from Wentworth and McCaffery.  The WLC

25  may find that such a type of business is not in the best interests of the public and serve the

1    public good but there must be substantial evidence in the record to support its findings. Arthur

2    v. Board of Registration in Medicine, 383 Mass. 229, 418 N.E.2d 1236, 1236, 1241 (1981),

3    Goodridge v. Director of Employment Security, 375 Mass. 434, 377 N.E.2d 927, 929 (1978).

4    "Substantial evidence" means evidence as a reasonable mind might accept as adequate to

5    support conclusion". Trustees of Forbes Library v. Labor Relations Commissions, 384 Mass.

6    559, 428 N.E.2d 124, 130 (1981).  Substantial evidence, however, is more than just some

7    evidence to support the conclusion of an administrative agency.  Cohen v. Board of

8    Registration in Pharmacy, 350 Mass. 246, 253, 214 N.E. 2d 63, 67-68 (1966).  Furthermore,

9    licensing boards are required to consider each application on its merits and are not allowed to

10    base their denial on a general policy that no further licenses will be issued.  See Turnpike

11    Amusement Park, Inc. v. Licensing Commission, 343 Mass. 435, 179 N.E. 2d 322

12    (1962)(Court reversed local board's denial of license to operate pinball machines based on a

13    general policy not to issue any such licenses.)

14        The WLC based its decision on testimony from Paul Wentworth that he did a survey in

15    November 2001 and that his survey results indicated that Woburn has the highest ratio of

16    package store licenses per thousand people of population than all surrounding towns. (Exs. 8B

17    page 54, 8D).  But Wentworth could not provide survey results in writing nor could he provide

18    names of the people he spoke to in regards to survey or the surrounding towns he did survey

19    with.  This survey goes against the principals of Ballerin, Inc. v. Licensing Board of Boston, 49

20    Mass.App.Ct. 506 (2000) which commands that the public need test "includes assessment of

21    public want and appropriateness of a liquor license at a particular location" – not city wide as

22    the WLC claims and especially not data from other surrounding towns.  See also Fieldstone

23    Meadows Development Corp v. Conservation Commission of Andover (MA Appeals Court

1    03-P-517 – October 2004) in which the MA Appeals Court ruled that the Andover's decision

2    was arbitrary and capricious because the Conservation Commission used other guidelines not

3    provided in town's by-laws or any regulations promulgated thereunder.  Wentworth's survey

4    method was never adopted by the majority of the WLC as a tool to determine public need (Ex.

5    9H1 page 4 – Maguire testifies that "public need" is determined by MGL c. 138).  It is not

6    listed in any of Woburn's by-laws or regulations as a method to determine public need.  And,

7    most important it is not listed in MGL c. 138, s 15, s.15A or s. 23 as a method to determined

8    public need.  Wentworth conducted his survey after Donovan presented to the WLC his survey

9    results indicating a public need at proposed location back in November 2001.  In other words,

10   Wentworth was out to prove Donovan wrong!

11          The WLC (Wentworth and McCaffery) was also worried about delivery.

12          The WLC (Wentworth and McCaffery) was also worried that PJD would sell license in

13   future or relocate license. (Ex. 8B pages 50,51,75).

14          The WLC, however, do not cite, nor does the public hearing transcript's (Ex. 8B) include,

15   generalized evidence nor specific evidence that support such claims.  "A mere speculation

16   concerning a matter of fact cannot form an adequate foundation for the … decision." Blue

17   Cross and Blue Shield of Massachusetts, Inc v. WLC Member of Insurance, 420 Mass. 707,

18   710, 652 N.E.2d 135 (1995).

19          The only two citizens' who spoke in opposition to PJD's application were Paul and Lori

20   Medieros (Ex. 8B pages 36-41, 9H, 9H5 page 2).  Both were sued in the RICO case file by

21   Donovan in 1998.  Mr. Medieros is the Woburn City Councilman who tried to ban this 8th

22   license in 1996 and failed.  Medieros's proposed bill to ban 8th package store license was driven

23   by the politically connected package store owners in the city of Woburn to limit competition.

- 23 -

1    Donovan exposed Paul Medieros in his RICO Complaint receiving monetary donations from

2    these package store owners in and around the time this bill was proposed.

3        PJD on the other hand, offered a comprehensive business plan, offered other material

4    information and offered oral presentation detailing the following; a brief historical overview on

5    his dealings with the WLC since 1995, gave an overview of his primary market, gave an

6    overview of his product to be sold, gave an overview of his internal policies regarding

7    deliveries and ID checking, gave an overview of hours of operation, gave an overview of his

8    management team and their experiences in the wine and spirits industry, gave an overview of

9    the benefits his company would provide to the city of Woburn, gave an overview of the zoning

10   settlement, gave an overview of the criteria of issuing a liquor license pursuant to  MGL c. 138

11   s. 15, gave an overview of the public need at proposed location and gave an overview of

12   relevant case law before the WLC and not limited to (Exs. 8B, 8E, 8H).

13       PJD does not present a case where its viewpoint merely differs from that of the WLC.

14   The WLC's viewpoint is unsupported by substantial evidence and, therefore, the WLC failed to

15   meets its statutory burden.

16       Notwithstanding the WLC's allowance of alcohol delivery by licensees (Ex. 8Q), a

17   Woburn City Council's 6-2 vote not to allow the WLC to prohibit the issuance of the eighth

18   license (Ex. 9E page 8), the WLC issuing said license in the 1960's (Exs. 12A, 12B, 12C), the

19   WLC allowance of other package store owners to expand and relocate, the WLC issued said

20   license to Donovan in 1995 (please note there has been minimal changes to Donovan's original

21   business plan from 1995, the only real change is from business/consumer as a primary target

22   market to just business as a primary target market) (Ex. 1A), a favorable decision overriding

23   the ABCC decision in 1999 from MA Courts (Ex. 2G), a Justice from MA Courts suggesting

1   that she would order this license issued once zoning was resolved (Ex. 7N page 61), a recent

2   ABCC ruling on point to PJD's matter (Ex. 8I), past support of over 160 taxpayers from

3   Woburn and past letters of support (Ex. 2C), two survey's conducted by Donovan to his

4   primary market both indicating a public need (Exs. 8F, 8G, 8K page1) and not limited to, the

5   Court must give weight to the discretionary authority conferred on the WLC by statute.  The

6   discretion lodged in the local authorities, however, is not unlimited.  Yerardi's v. Board of

7   Selectman of Randolph, 19 Mass.App.Ct. 296, 473 N.E.2d 1154, rev. den 394 Mass. 1103, 477

8   N.E.2d 595.  As stated above, insuring that the decision was made fairly and with the

9   appearance of fairness is a factor to be considered.  Board of Selectman of Barnstable, at 1017.

10      Furthermore, Wentworth's "public need" survey of November 30, 2001 which he

11   concluded that Woburn had the highest issued number of package store licensed issued per

12   population is clearly wrong.  According to Annual Reports filed with the ABCC by Woburn

13   and surrounding towns and based on population census from US Census Bureau, the Town of

14   Burlington has the highest ratio of  (5) licenses issued to a population of 22,876 or .0022

15   percent.  Woburn is at 7 licenses issued to a population of 37,258 or .0019 percent.  The town

16   of Wilmington is at 4 licenses issued to a population of 21,963 or .0018 percent. (Exs. 8T,

17   8T1).

18      Furthermore, PJD made a good faith effort to relocate from 345 Washington Street to 30

19   Cedar Street to limit street exposure and walk-in business (Ex. 8A).  While the WLC have

20   allowed other package stores to relocate to heavily traveled streets.  For example, in June 2000,

21   they allowed S&L to relocate to Main Street from Salem Street.  Although Salem Street is

22   heavily traveled, Main Street has much more traffic, with more street exposure than S&L's old

23   location.  This was the same story with Giles Markets in 1995 when they moved from

1    Montvale Avenue to Cambridge Road.   WLC never took this into consideration when making

2    their decision.

3        Furthermore, Wentworth went on record in February 2003 before MA Court, saying that

4    his main focus in granting a new license or license transfer is new owner's years of experience

5    in the business.  PJD's management team has over thirty years of direct experience in the wine

6    and spirits industry.  The WLC never took this into consideration when making their decision

7    (Ex. 8E page 9).  Please note:  By contrast, the combined experience of Wentworth and

8    McCaffery does not exceed 15 years.

9        Furthermore, PJD is going to hire six employees for his company with first job

10   preferences going to unemployed Woburn resident.  Putting people back to work is a top

11   priority of the federal and state government.  The WLC never took this into consideration when

12   making their decision.  Their decision goes against state and federal policy (Ex. 8B page 15,

13   8E, page 10).

14       Furthermore, PJD has signed an agreement with city of Woburn that he would not have

15   refrigeration, would not sell nips or ½ pints, would not sell condiments, would not have neon

16   signage in windows, would not advertise address in local papers etc.  The WLC disregarded

17   this zoning agreement (Ex. 7Q, 7S).

18       Furthermore, PJD completed two surveys to his target primary target market and the

19   response was there is a public need for his type of service at proposed location. (Exs.8F, 8G,

20   8K page 1).  When PJD indicated to the WLC that he would do another survey to address

21   "public need" to his primary market under WLC's guidelines, they refused to take PJD up on

22   his offer. (Exs. 8C, 8B pages 59-60).

- 26 -

1     Furthermore, at least fourteen (14) MGL c. 138, section 12 licenses (hotel/restaurant on-

2     premise licenses) are directly located in Woburn's Industrial Park.  These establishments are

3     geared towards servicing the business people coming in and out of the park on a daily basis

4     (Ex. 8P).  Not one Section 15 license (package store – off premise sales) is located directly in

5     the park solely servicing and catering to the needs of these business people who come to this

6     park (Ex. 8O).  The WLC did not take this into consideration when rendering their decision.

7     Furthermore, PJD would have the strictest ID checking policy in the city.  No one will be

8     able to purchase product without proper ID regardless of age.  All deliveries would have to be

9     signed for by a person of age with delivery log available for local and state authorities.  The

10     WLC did not take this into consideration (Exs. 8E page 7, 8B page 10).

11     Furthermore, in January 2004 Wentworth and McCaffery both voted to allow Bickford's

12     Restaurant to have a full liquor license with conditions (Ex. 13A pages 2, 3).  Then in

13     December 2004 the WLC allowed another restaurant to have a full liquor license – Restorante

14     II Ducalli.  Both McCaffery and Wentworth voted in favor to issue said license (Ex. 14A, page

15     2).

16     Furthermore in August 2002, Wentworth and McCaffery demanded that Donovan come

17     before the license commission to hear his May 2002 license application even though MA

18     Courts "stayed" license matter from being heard until Donovan resolved zoning matter (Exs.

19     7J, 7K). Wentworth's and McCaffery's motive behind this meeting was to determine

20     Donovan's "character" for an incident Donovan had with Maguire's friend at Woburn Country

21     Club in January 2002 (Exs, 7C, 7D, 7G, 7H, 7I, 7K, 7L, 7M, 7N, 7O, 7P).  The Woburn Police

22     and the WLC never sought Donovan's side of the story, nor did they speak to Donovan's sole

23     witness on what happened in their investigation (Ex. 7I).  They (Wentworth and McCaffery)

- 27 -

1   only heard one side of the story – Maguire's friend and the Pub at Woburn CC's side of story.

2   Donovan knew Wentworth and McCaffery were going to blind side him at this August 2002

3   meeting, so he did not attend.  Donovan reported the Pub at Woburn CC to the ABCC for over

4   serving alcohol undermining the WLC in regards to this incident. The Pub at Woburn CC is a

5   political hangout and Wentworth plays golf at Woburn CC at least five days per week (Ex. 7G,

6   7H).  It is also alleged that Wentworth was acting on behalf of the Woburn Golf and Ski

7   Authority to "crucify" Donovan for him questioning the over serving of liquor at Woburn CC

8   and to protect their liquor license at all cost. Wentworth was going to use Donovan's license

9   application hearing as a trial and not go after Woburn CC for over serving alcohol, the one's

10  who had the liquor license.  In February 2003, MA Courts took jurisdiction of Donovan's

11  character because they understood that the WLC/WPD investigation was one sided and where

12  going to use it against Donovan in his license hearing.

13      Furthermore in April 2001, the WLC (Wentworth, McCaffery and Maguire) reported

14  Donovan to the ABCC for him supposingly selling a liquor license that he did not have. Again,

15  the WLC was trying to get Donovan on something illegal so they could deny him on character.

16  The ABCC contacted Donovan and an old partner of his, Dan Bane regarding this matter.  This

17  matter was well documented in the local newspaper (Exs. 4A, 4B, 4C, 4D).

18      Furthermore, Wentworth and McCaffery went on record in May 2001 that they only

19  opposed P. D's license application because of zoning only (Ex. 5C, page 61). In fact, it was

20  Wentworth who sought another zoning opinion from building commissioner in May 2002 (Ex

21  5E, page 2). In addition since 1996, Wentworth's big issue "at public hearings" prior to July

22  2003 was zoning.  A more specific statement of reasons for Wentworth's and McCaffery'

23  reversal would "ensure administrative justice" and "encourage public confidence in the

- 28 -

1    administrative process." Dixie's Bar, Inc. v. Boston Licensing Board, 357 Mass. 699, 702, 259

2    N.E.2d 777, 779 (1970). Forsyth School for Dental Hygienists v. Board of Registration in

3    Dentistry, 404 Mass. 211, 217 (1982); V.S.H Realty, Inc. v. License Board of Worcester, 13

4    Mass.App.Ct. 586 (1982).

5                                        **CONCLUSION**
6
7        Going back to 1996, it was Wentworth, under watchful eye of McCaffery in 2001, 2002

8    and 2003, who always raised the zoning issue. Donovan proved them wrong in May 2003 on

9    zoning matter. It was Wentworth, under watchful eye of McCaffery, who had to complete a

10   survey in November 2001 to undermine Donovan's survey he completed in October 2001.

11   Donovan proved that their survey was clearly wrong. It was Wentworth, under watchful eyes

12   of McCaffery, who questioned Donovan's character and tried to use it against him. Donovan

13   proved them wrong by having MA Courts take jurisdiction over his character because the court

14   understood that the Woburn CC incident was one sided. It was Wentworth, under watchful eye

15   of McCaffery, who brought up the delivery issue. Donovan proved them wrong showing other

16   license holders had delivery licenses and who delivered to residential addresses. It was

17   Wentworth under watchful eyes of McCaffery, who brought up that the agreed upon zoning

18   conditions can't be enforced. Donovan proved that conditions have been used by other liquor

19   license holders in the city of Woburn, proved that reasonable conditions are recommended by

20   the ABCC, proved that conditions are used by many cities and towns across the

21   Commonwealth and proved that the conditions can be enforced. As a last resort both

22   Wentworth and McCaffery bring up that there is no public need to issue license. Donovan

23   proved that there is public need for his business at proposed location and Donovan has shown

24   other substantial evidence that supported this need and the issuing of said license. In August

- 29 -

1    2000 after license matter was remanded back to WLC from MA Courts, it was Wentworth,

2    under watchful eye of McCaffery, who stated *"rather than go through all of the above and*

3    *possibly require Peter Donovan to commit to some sort of lease requirement/cost, and we*

4    *might be criticized for causing him un-needed cost, that we go directly back to ABCC/Judge*

5    *Zobel and have them hear our side/opinions"*. **(Ex. 2I, page 2)**  Again, the MA Courts have

6    ruled in Donovan's favor on all occasions except the current issue before MA Court of

7    Appeals.   The above only demonstrates that Wentworth and McCaffery will deny Donovan

8    license at all cost and does not matter what kind of business Donovan proposes - all in

9    retaliation because they are out to get Donovan for filing lawsuits etc.

10       The city of Woburn and members of the WLC (Wentworth and McCaffery) have allowed

11   package stores to expand and relocate without addressing public need etc.  They have allowed

12   new restaurants to obtain liquor licenses without addressing public need (please note: it is

13   common knowledge that most drinking and driving incidents occur from people driving after

14   leaving a bar or restaurant).   They have allowed restaurant liquor licenses to be conditioned.

15   They have allowed package stores to deliver product, without addressing their concerns about

16   delivering to underage drinkers, etc.  They have allowed direct competitors of Donovan to

17   operate within the same office park of Donovan's proposed location – like the Chocolate

18   Truffle, Cookies by Design, Basket Builders, Edible Arrangements and other corporate gift

19   companies.  All the while the WLC has consistently denied PJD this license on public need,

20   zoning, delivery etc.  Donovan's ten year effort to obtain an Off-Premises All-Alcoholic

21   license has been blocked at every turn by a license board determined to not grant him a license

22   regardless of whether he meets all of the requirements of MGL C. 138 s. 15.  Donovan has

1    repeatedly demonstrated that he does meet the requirements for approval of a license under s.

2    15

3    PJD has alleged from day one, and not limited to the following, that these constant

4    denials are all in retaliation, with the intent to harm PJD, for him filing suits against city

5    officials, for undermining city officials, for being a critic of Woburn's political system and for

6    reporting certain city officials to state and federal agencies etc. Before March 1995 when the

7    WLC did issue said license to PJD/BBWC, PJD was never a "public" critic of the political

8    system in Woburn. The denials started when PJD became a critic. See also Board of County

9    Commissioners, Wabaunese County KS v. Umbehr, 116 S. Ct. 2343 (1996) on Freedom of

10    Speech.

11    Recognizing the existence of claims such as Donovan's is important. There are instances

12    when government officials seek to "get back" at a person or retaliate for reasons that are

13    reprehensible and illegitimate but not related to the person's exercise of a protected right. In

14    such circumstances, no other federal claim will lie for the denial of equal treatment. The Equal

15    Protection Clause "has long been understood to provide a kind of last-ditch protection

16    governmental action wholly impossible to relate to legitimate governmental objectives."

17    Esmail, 53 F. 3d at 180.

18    Similarly, irrational and vengeful discrimination against an individual may in reality be

19    class-based discrimination that is simply not immediately self-evident. The victim may, for

20    example, just happen to be the first member of a vulnerable group to suffer the discrimination

21    treatment. Or the person may be the applicant for a government job whose employment would

22    violate the silent quota limiting women or racial or ethnic minorities to existing numbers in the

23    workforce. In either instance it might be difficult to plead or prove traditional class-based

1   animus but still be possible to show treatment that departs so dramatically from the norm as to

2   show, at the very least, personal vindictiveness that cries out to redress by federal courts.

3   In short, "if the power of government is brought to bear on a harmless individual merely

4   because a powerful state or local official harbors a malignant animosity toward him, the

5   individual ought to have a remedy in federal court." Id. At 179.

6       For all of these reasons, this Honorable Court must issue a partial summary judgment in

7   Plaintiff's favor and enter any other order or award that justice may require.   Honest

8   government matters and this court must send that message loud and clear by issuing partial

9   summary judgment in Plaintiff's favor.

10
11   April 13, 2005

12
13
14   Peter J. Donovan
15   35 Longmeadow Road
16   Arlington, MA 02474
17   781-643-2848
18
19
20   CERTIFICATE OF SERVICE
21
22   I, PETER J DONOVAN, SERVED A COPY OF THIS MOTION And Supporting Documents
23   UPON THE DEFENDANT'S ATTORNEY VIA First class mail on April 13, 2005.  SIGNED
24   UNDER THE PAINS AND PENALTIES OF PERJURY.
25
26
27
28   PETER J. DONOVAN

- 32 -