# Exhibit 11

## COMMONWEALTH OF MASSACHUSETTS
### MIDDLESEX SUPERIOR COURT

3

4

PETER J. DONOVAN, Pro Se,          )    Case No.: No. 03-3568
                                   )
5                                  )
         Plaintiff                 )
6                                  )
Vs.                                )
7                                  )
                                   )
CITY OF WOBURN, CITY OF WOBURN )
8                                  )
LICENSE COMMISSION, PAUL           )
9                                  )
WENTWORTH, OWEN McCAFFERY          )
                                   )
10                                 )
and J. KEVIN MCGUIRE,              )
11                                 )
         Defendants.               )
                                   )

12

### BRIEF IN SUPPORT OF PLAINTIFF'S
13          ### MOTION FOR SUMMARY JUDGEMENT

14

15          I.          STATEMENT OF CASE

16          This is an action in the nature of certiorari, pursuant to G.L. c.249, s.4. The plaintiff,

17   Peter J. Donovan (PJD), seeks judicial review of a decision by the Woburn License Commission

18   (WLC) dated August 5, 2003. (Exhibit A to Complaint).

19          On July 31, 2003, the WLC denied PJD the 8th all alcoholic package store license (off-

20   premise license) for a second time, which is needed to operate his corporate gift service offering

21   wine related gift baskets and not limited to. The first denial was on June 27, 1996, when PJD

22   applied to the WLC for a license (under The Boston Beer and Wine Company - BBWC) to sell

23   all alcoholic beverages[1]. After the first public hearing was held, the WLC issued a decision

24

25

---

[1] GL c.138, s.15, provides for the issuance of licenses by the local
authorities of any city or town "to sell all alcoholic beverages or
wine and malt beverage license only" - (off premise license - package
store)

rejecting the application. PJD/BBWC appealed the denial of its application to the Alcoholic Beverages Control Commission (ABCC). The ABCC conducted a hearing and upheld the WLC decision. PJD/BBWC then appealed the ABCC's decision to this court pursuant to G.L. c.30A. The Boston Beer and Wine v. ABCC, docket number 97-4332. In August 1999, this court overturned the ABCC decision and ordered the matter remanded.(Exhibit B of Complaint). The ABCC remanded the matter back to the WLC in June 2000 after a contempt of court charge was filed against them by PJD in May 2000 (Exhibit C to Complaint)[2].

Since the ABCC remanded matter back to WLC in June 2000, the WLC have always contended that PJD's proposed location was illegally zoned and would not hold a public hearing on PJD's application. The WLC sought zoning opinions from the city solicitor and the building commissioner not knowing all the relevant facts regarding PJD amended business plan. Nor did the WLC know the history of the prior businesses located at the particular space PJD proposed to lease when seeking said opinion. This information is crucial when seeking a zoning opinion. (Exhibits D, E and F to Complaint). This went back and forth over a three year period and in May 2003, the zoning matter was finally resolved between the City of Woburn and PJD. The case that this settlement comes under is Peter J. Donovan v. Woburn Zoning Board of Appeals, et. al. docket number 02-3386 (Exhibit G to Complaint). A final or second public hearing was held before the WLC on July 31, 2003 on PJD's application. The WLC again rejected the application stating "no public need" existed for another package store license to be issued in

---

[2] The ABCC is powerless to act on a license application in a manner contrary to a decision of local authorities except make a recommendation to the local board. *Largess v. Nore's,* 341 Mass. 438 (1960).

1   Woburn and not limited to.  On August 28, 2003, PJD filed this appeal pursuant to G.L. c. 249,

2   s.4 seeking relief in the nature of certiorari[3].

3   **REFERENCES:**

4       The facts referred to for purposes of this motion are taken entirely from the

5   administrative record (<u>BBWC</u>, 97-4332)[4], the transcripts[5] made at the public hearing (July 31,

6   2003) of PJD's application, the exhibits introduced into the record at that time (July 31, 2003)

7   and from directly related cases filed in this court; <u>Peter Donovan v. Woburn License</u>

8   <u>Commission et. al.</u>, docket number 02-0349, <u>Peter Donovan v. Woburn License Commission et.</u>

9   <u>al.</u>, docket number 02-2230 and <u>Peter Donovan v. Woburn Zoning Board of Appeals et. al.</u>,

10  docket number 02-3386.

11

12       Also, PJD would like to enter the following into evidence; Complaint filed in this matter

13  with attached Exhibits, <u>BBWC - </u>97-4332 (record exceeds 500 pages), <u>PJD - </u>02-0349 (record

14  exceeds 250 pages), <u>PJD - </u>02-2230 (record exceeds 500 pages) and <u>PJD - </u>2-3386 (record

15  exceeds 250 pages).  It is quite obvious that these cases have volumes of documents and PJD

16  would rather not copy complete files from these cases until further notice from this court on how

17  to proceed.  <u>By not copying and certifying these files at this time</u>, it will save PJD a substantial

18  amount of money ($2.50 per page times at least 2,000 documents) and it will make this case

19  more manageable for all parties involved including this Court.  Plus, the defendant's have copies

20  of all complaints and documents filed with these cases.  In addition, if the defendants want any

21

22

23  [3] The ABCC has no jurisdiction over a re-appeal of the denial of a
    license.  G.L. c.138, s.23, eighth par., and s.67, third par.

24  [4] References to the Administrative Record will be cited AR___.  Please
    note: the AR case number 97-4332 was not copied for this motion to save
25  money and file space.  This court has a copy of this record and so does
    the Defendants.  If the defendants want a certified copy of AR, PJD
    will provide one.

1   item certified such as certain Exhibits, PJD will gladly do so.  See, _Tetrault v. Mahoney, Hawkes_

2   _& Goldings_ (1997) 425 Mass 456, 681 NE2d 1189.

## II. STANDARD OF REVIEW

Judicial review of the WLC's action is conducted under the authority contained in G.L.

c.249, s.4 which provides, in pertinent part: "[a] civil action in the nature of certiorari to correct

errors in proceedings which are not according to the course of the common law, which

proceedings are not otherwise reviewable by motion or by appeal, may be brought in the ...

superior court".[6],[7]  Review by certiorari is for the purpose of examining and correcting errors of

the law manifest upon the record. _Canny v. Municipal Court of the City of Boston_, 368 Mass.

648 (1975).

In a certiorari action pursuant to G.L. c. 249, s. 4, the court must consider "the nature of

the action sought to be reviewed" to determine the appropriate standard of review. _McSweeney_

_v. Town Manager of Lexington_, 379 Mass. 794, 800 (1980), quoting _Boston Edison Co. v. Boston_

_Redevelopment Auth._, 374 Mass. 37, 49(1977); _Commissioner of the Boston Police Department_

_v. Department of Personnel Administration_, 39 Mass. App. Ct. 360 (1995).  Where there is a

broad standard afforded the administrative body, the court is limited to a search for "error of law

or abuse of discretion, as measured by the arbitrary and capricious test." _Caswell v. Licensing_

_Comm'n for Brockton_, 378 Mass. 864, 878 (1983).  Also, this court has jurisdiction to determine

---

[5] References to the transcript of the hearing before the WLC (July 31, 2003) will be referred to as TR____.

[6] Local licensing boards are not state agencies and, therefore, decisions of those boards are not subject to review under G.L. c. 30A, s. 14.  _Dixie's Bar v. Boston Licensing Board_, 357 Mass. 699, 702 (1970)\.

[7] Also see, _Ballerin, Inc. v. Licensing Board for City of Boston_ (2000) 730 N.E. 2d 904, Mass.App.Ct. 506.

1  if the WLC's decision was made fairly and with the appearance of fairness. *Board of Selectman*

2  *of Barnstable v. ABCC*, 373 Mass. 708, 369 N.E.2d 1011, 1017 (1977).

3      Here, Peter J. Donovan (PJD) seeks judicial review of the WLC's Decision to deny the

4  application for an all-alcoholic beverages package store license pursuant to G.L.c.138, s.23,

5  which statute provides in relevant part:

6

7      The provisions for the issue of licenses and permits hereunder imply no intention to
        create rights generally for persons engage or continue in the transaction of the business

8      authorized by the licenses or permits respectively, but are enacted with a view only to
        serve public need and in such manner as to protect the common good and, to that end, to

9      provide, in the opinion of the licensing authorities, an adequate number of places at
        which the public may obtain, in the manner and of the kind of use indicated, the different

10     sorts of beverages for the sale of which provided is made . . .

11     Whenever, in the opinion of the local licensing authorities, any applicant for a license
        under, twelve, fourteen or fifteen or thirty A fails to establish to their satisfaction his

12     compliance with the requirements of this chapter, or any other reasonable requirements,
        which they may from time to time make with respect to licenses under said sections,

13     respectively, or to the conduct of business by any licensee thereunder, said authorities
        may refuse to issue or reissue to such applicant any such license. . .

14

15     The WLC's decision rejecting PJD's application for a package store license must be

16  vacated for the following reasons: (i) public need in this context "by having the highest amount

17  of package store licenses issued than all surrounding towns" is irrelevant, because 1.) the

18  requirement of public need was met when the WLC first issued this license in the 1960's, 2.) the

19  requirement of public need was met when WLC was willing to issue said license to PJD/BBWC

20  in March 1995 with conditions.  3.) there is substantial evidence that this claim made by the

21  WLC (Wentworth) is clearly wrong, because the town of Burlington has the highest amount

22  issued per population. 4.) there has been overwhelming support to issue said license to PJD.  5.)

23  since 1995, the WLC has continued to issue licenses and allow package stores to double and

24  triple in size.  6.) PJD conducted two blind surveys to his primary target market (businesses only)

25  that indicated that there was a public need at proposed location.  7.) the WLC has no method in

place to determine public need other than G.L. c. 138;  (ii) the WLC's requirement of public

need in this context is arbitrary and capricious because it is irrational and unreasonable; (iii)  the WLC's finding of an adequate number of places for the public to obtain alcoholic beverages is arbitrary and capricious and not supported by substantial evidence. (iv) WLC's claim on ability to condition a license. 1.) PJD had no conditions on license;  (v) WLC's claim of ability of proper control and need of mail order delivery business.  1.) Going back to the 1960's and currently, other package stores have been allowed to deliver product to residential addresses without scrutiny by the WLC. 2.) PJD conducted two blind survey's to his primary target market and the results indicated that there was a "public need" for this type of business at PJD's proposed location; (vi) WLC claim on concern of possible sale of license or transfer of license to become a full package store. 1.) PJD has no intentions of selling this license or transferring this license.

## III. STATEMENT OF MATERIAL FACTS

1.) The WLC is the duly constituted licensing authority for the Cit of Woburn pursuant to G.L. c.138, s.4.

2.) This matter was first heard by the WLC in March 1995 in which the WLC granted said 8th full package store license (2 to 0 vote) to PJD under The Boston Beer and Wine Company, Inc. with the condition that PJD would only sell beer and wine. (AR 0182-0188), then in June 1995 the WLC reversed their decision (1 for Maguire to 1 vote against Galante) to deny PJD the license because the condition could not be met.  This matter was appealed to the ABCC in August 1995 pursuant to MGL c. 138 s. 67 to which the ABCC upheld the WLC decision.

3.) In June 1996, PJD again applied for this 8th full package store license under The Boston Beer and Wine Company, Inc. with no conditions on license and the WLC denied the license (3 to 0 vote)(AR 0011).  This matter was then appealed to the ABCC in May 1997 pursuant to MGL c. 138 s. 67 to which the ABCC upheld the WLC decision (AR 0100).  The ABCC's decision was then appealed to this court pursuant to MGL c. 30A to which this court

overturned the ABCC's decision on August 17, 1999 ordering the ABCC to remand matter back to WLC for further hearing. (Exhibit B to Complaint).

4.) Between August 1999 and May 2000, PJD had to file a contempt charge against the ABCC for not remanding this matter back to the WLC per court order dated August 17, 1999. On June 30, 2000, the ABCC finally remanded matter back to the WLC. (Exhibit C to Complaint).

5.) Over a period of three years, PJD went before the WLC regarding this matter, in September 2000, May 2001, November 2001, May 2002 and July 31, 2003. In September 2000, May 2001, November 2001, May 2002 the WLC denied PJD a Public Hearing on PJD's license application because of zoning matters or denied him license outright because of zoning. All hearings were for addresses (345 Washington Street, 325 Washington Street and 30 cedar Street) are within an eighth 1/8 of a mile of 25 Olympia Avenue, which was the original location stated on the application filed before WLC in June 1996.

6.) Specifically, in June 2001 PJD went before the WLC on his application for 325 Washington Street. The WLC sought a zoning opinion from the city solicitor without knowing all the relevant facts regarding PJD's business or proposed use of space. The WLC denied PJD the license because of zoning (Wentworth, Maguire and McCaffery) and public need (Maguire only). This matter was never appealed to this court because PJD could not appeal a zoning opinion from a city solicitor and because the matter had so much publicity in the local papers and the landlord was getting questioned on handicap requirements by city officials (never before was the landlord questioned on handicap matters, it only happened after PJD applied for this license at his property), he would not sign a lease with PJD.

A.  Wentworth's decision from the Administrative Record page 61 dated May 31, 2001; (Exhibit 12)

" *I'm opposed to the issuance of the license because no one authority or this licensing board has the authority to bypass or ignore zoning requirements. This is an O-P zone. It is against the ordinance and also, as stated before, this required a special permit fro the City Council and we had no right to change that without their proper authority. Therefore, I'm opposed to issuance of the license*"

1

2        B.   McCaffery's decision from the Administrative Record page 61 dated May
        31, 2001: (Exhibit 12)

3

4          *"The reason I'm opposed to it is because the letter here states in other*
  *words the local licensing authority has no jurisdiction whatsoever to override or*

5      *circumvent zoning regulations through the exercise of its discretion.*
              *I vote against it."*

6

7         7.) Then September 11, 2001 came along and PJD had to change the way he did business,

8    as did most businesses throughout the world. He changed the name of the company from The

9    Boston Beer and Wine Company, Inc. to Corporate Wine and Gift because of the negative

10   publicity BBWC has received over a seven-year period in the local papers – directly relating to

11   this 8th package store license and his dealings with the WLC and other city of Woburn officials.

12   There have been over 150 articles regarding PJD and BBWC in the local newspapers since 1995.

13   PJD is still 100% shareholder of BBWC. He changed the ownership structure from S-Corp to

14   Sole Proprietorship for financial planning purposes. He changed his primary target market from

15   consumer/business to business only (B to B), because under the new business model it allows

16   PJD to become more "focused". He did away with importing and brokering of wines, because it

17   became tough to deal with oversea vendors because of new rules on importing and exporting

18   after 9/11. He changed his product to be sold from beer and wine of the month clubs to wine gift

19   baskets as corporate gifts, non-alcoholic gift baskets or arrangements as corporate gifts, wine

20   racking systems to be sold to high end retailers and wine, because it allows PJD to become more

21   focused on one market. (Exhibit 1, TR 6–10).

22        8.) In November 2001, PJD applied for the license under a sole proprietorship DBA

23   Corporate Wine and Gift with the sole focus (primary target market) on the 10,000 businesses

24   within a five-mile radius of proposed location (345 Washington Street, Woburn, MA). Again,

25   the WLC sought a zoning opinion, this time from the Building Commissioner. The WLC sought

this opinion without having any relevant facts regarding PJD amended business plan. And most

important, the WLC did not have the relevant information regarding the history of the particular

1   space or PJD proposed use when seeking such an opinion. Again the WLC denied PJD a public

2   hearing because the zoning was illegal. (Exhibit D to Complaint).

3       9.) Then in May 2002, PJD found another location (30 Cedar Street) and applied for the

4   license under dba Corporate Wine and Gift. Again, the WLC sought a zoning opinion from the

5   Building Commissioner not knowing all the relevant facts regarding the premises and PJD's

6   business (Exhibit E and F to Complaint). Also, PJD caught wind from his local sources that the

7   WLC were going to derail the public hearing on the "character issue" because PJD got into a

8   "pushing match" in January 2002 with WLC Maguire's close friend. This matter is well

9   documented in <u>Donovan,</u> 02-2230. PJD's application was never heard by the WLC. PJD

10  appealed the Building Commissioner's decision to this court in <u>Donovan</u> 02-3386. The zoning

11  matter was settled between parties in May 2003. (Exhibit G to Complaint).

12      10.) In June 2002, this Court "stayed" (Justice Kerns) the license matter until all zoning

13  matters were resolved. (Exhibit H to Complaint).

14      11.) In addition, in February 2003 this Court further put an "injunction" on license from

15  being issued until all zoning matter were resolved (Justice Fahey). (Exhibit I to Complaint).

16      12.) On June 19, 2003, PJD submitted an application <u>(with no conditions on license)</u> for

17  the 8th full package store license to the WLC to meet the customer demand for wine gift baskets

18  and other gift arrangements.

19      13.) The first application had 345 Washington Street listed on it. 345 Washington Street

20  is a heavily traveled street with up 45,000 cars per day traveling it. PJD never wanted this much

21  visual exposure and he wanted to limit walk in traffic because under his new business model, it

22  does not really allow for walk in traffic. So he amended his June 19, 2003 application, after

23  working with the owner of the property, Cummings Properties, who found another unit/space

24  located at 30 Cedar Street. 30 Cedar Street is located directly behind 345 Washington Street. It

25  has no street exposure from Washington Street and limited exposure from Cedar Street. (Exhibit

    J to Complaint).

1

14.) The proposed space at 30 Cedar Street is roughly 2,500 square feet. 5% of this

2

space or 125 square feet will be use for accessory retail. This accessory retail space will

3

accommodate walk in business and on site gift pick-ups.

4

15.) Cummings Properties would like PJD to be a tenant because his business provides a

5

"niche" service to other Cummings Property tenants that is not currently available. Plus,

6

Cummings Property would like PJD as a tenant, because PJD is willing to sign a long-term lease.

7

16.) On July 31, 2003 a second hearing was held before the WLC. (Exhibit 1).

8

17.) At the public hearing (July 31, 2002) Chairman of the WLC J. Kevin Maguire

9

recused himself from all proceedings because of a conflict between PJD and his close friend. See

10

Donovan 02-2230. Wentworth and McCaffery were the only members voting on PJD's

11

application. (TR 2)

12

18.) At the public hearing (July 31, 2003), PJD presentation was roughly one and half

13

hours long to which he gave a brief historical overview on his dealings with the WLC since

14

1995, gave an overview of his primary market, gave an overview of his product to be sold, gave

15

an overview of his internal policies regarding deliveries and ID checking, gave an overview of

16

hours of operation, gave an overview of his management team and their experiences in the wine

17

and spirits industry, gave an overview of the benefits his company would provide to the city of

18

Woburn, gave an overview of the zoning settlement, gave an overview of the criteria of issuing a

19

liquor license pursuant to MGL c. 138 s. 15, gave an overview of the public need at said location

20

and gave an overview of relevant case law. (Exhibit 1).

21

19.) At the public hearing (July 31, 2003), PJD presented the following evidence to

22

establish "public need" for this type of business at this "particular" location pursuant to MGL. c.

23

138 s. 23:

24

      a.     Going back to the 1970's this 8th package store license was issued in the

25

           city of Woburn. The license was originally issued to Mayor Gilgun's brother who

then sold it to Martignetti in or around 1973. In 1978 Martignetti had to give the

license back to the city of Woburn pursuant to case law *Johnson v. Martignetti*

(1978) 375 N.E. 2d 290, 374 Mass. 784. This is how this license became/is available today. (TR 16 –26)

b.      The population in Woburn in the 1970's was roughly 37,000 and in 2003 it is at 37,260 pursuant to U.S. Census Bureau, Census 2000. The only difference between Woburn today and in the 1970's is the daily traffic, which is 1,000 times more than it was in the 1970s and new businesses due to the creation of Woburn's Industrial Park. A majority of this traffic is due to the 3,000 or so businesses that operate within the city. A majority of these businesses are located in the Northeast corner of the city in Woburn's Industrial Park, which includes West Cummings Park and Cummings Park. Woburn Industrial Park was in the planning stages in the 1960's and 1970's. Cummings Park was built in the late 1970's early 1980's. Route 128 and Route 93 intersect at this corner of the city and has been labeled as the busiest traffic intersection in the Commonwealth. Most of this traffic is due to the inflows and outflows of traffic coming from Woburn Industrial Park. To alleviate this traffic problem, the Commonwealth made a separate on/off ramp into the Industrial Park north of Route 128 on Route 93 in 2000. (AR Vol III at 0012, TR 16-26, Exhibit 9)

c.      Woburn Industrial Park has at least fifteen (15) MGL. c. 138 s. 12 licenses (restaurant/hotel/on site- pouring license) servicing this particular business market on a daily basis. Or, more than 34% of all liquor licenses issued in the city of Woburn are located in this park. A majority of these licenses were issued between 1984 and 1996 to which Maguire sat on the WLC. These restaurants are mostly regional and national chains including, but limited to, Fridays, Bertucci's Pizza, Joes American Bar and Grille, 99 Restaurant, Chicago Bar and Grille etc. (AR 0007, AR 0137, TR 16-26, Exhibit 9 and Exhibit 17)

d.      Woburn Industrial Park does not have one MGL. c. 138 s. 15 license (off premise license/package store) located within it's general area to support the

businesses and people who come into this park on a daily basis. It is estimated that up to 30,000 people work in this park. The nearest location for a MGL c. 138 Section 15 license within Woburn is roughly 2.5 miles away. In Reading on the north-side of the park the nearest location is roughly two miles away. In Stoneham on the northeast side of the park, the nearest location is roughly two miles away. (TR 16-26, Exhibit 9, AR Ex-I).

e.      Not one package store located in Woburn or surrounding towns, solely focus on the 10,000 businesses within a five-mile radius of Cummings Park/Woburn Industrial Park. In addition and to the best of PJD's knowledge, there is no business within Massachusetts that hold a package store license that solely focus on wine gift baskets as corporate gifts. (TR 16-26, Exhibit 3)

f.      PJD proposed location is at 30 Cedar Street, which is in Cummings Park. There are no neighborhoods, churches or schools in this area and it is zoned strictly for business. This location is ideal for PJD's business because of it's proximity to RT. 128 and RT. 93 (distribution). (AR 0137, TR16-26)

g.      Comments made by Maguire over the years:

- In 1992, Chairman Maguire said, *"that he wanted this license issued under his tenure"*. Maguire has been on the WLC since 1984. (Exhibit 13)

- In March 1995, Maguire voted in favor of issuing license to PJD regardless of conditions and said, *"that it was the best presentation and was the best interest of Woburn to have its license issued to BBWC, because of it's location etc." (AR 0182-0183).*

h.      In 1996, 160 taxpayers, residents and business owners signed a petition in support of issuing Woburn's 8th all alcoholic package store license to BBWC/PJD in 1995/1996. Today, many of these people still support the issuing of this license to PJD. This list was signed by people from "all walks of life" that included doctors, lawyers, Woburn School Teachers, Woburn Police Officers,

Woburn Firemen, local business owners, Woburn City Councilman, Woburn School Committee Members, Plumbers, Carpenters, Truck Drivers, etc. In addition, letters in support of issuing this license to PJD were sent to the Mayor and WLC. (AR 0144-0152, 0239-0251, 0362 and at 0363). The reason PJD had people sign the above list and send letters to city officials was because former Chairman of the License Commission (Dennis Donovan – PJD's father) indicated that he heard from "all walks of life" in opposition to this license when Kevin McDonough applied for it in 1992. PJD confronted his father on this issue, but Chairman Donovan could not produce one person's name he spoke to. (Exhibit 13, page 2 and TR 16).

i.      In 1996, the Woburn City Council (elected officials) voted to keep this 8th full package store license on the cities books and voted to get rid of the beer and wine package store licenses through a home rule petition that became law in 1997. (AR 0419).

j.      In November 2001 PJD completed a survey to his primary market (sample sent to 250 businesses within Woburn's Industrial Park). 92% of the respondents indicated that there was a *"public need"* for this type of business at this *"particular location"*. 92% of the respondents indicated that they would purchase a product from PJD. 95% of the respondents indicated that the hours of operation were adequate. (Exhibit 3,4,7,TR 17)

k.      In March 2003, PJD conducted another survey to his primary target market (sample sent to 102 businesses within Woburn's Industrial Park). 71% of the respondents indicated that there was a *"public need"* for this type of business at this *"particular location"*. 81% of the respondents indicated that they would purchase a product from PJD. 95% of the respondents indicated that the hours of operation were adequate. (Exhibit 3,4,8, TR 18).

l.      In August 1995, the WLC allowed Giles Liquor to relocate and expand from 500 square feet to 1,700 square feet.   Woburn City Councilman Scott Galvin family owns Giles Liquor. (Exhibit 19, TR 20).

m.      In July 1997, the WLC allowed Giles Liquor to relocate again and expand from 1,700 square feet to 5,300 square. (Exhibit 19, TR 20)

n.      In June 2000, the WLC allowed S&L Liquors to relocated and expand from 2,000 square feet to 4,200 square feet.  The owner is quoted in the newspaper as saying *"I need the space so I can make more money"*. (Exhibit 20, TR 20).

o.      On June 17, 2002, Judge Kerns went on record as follows,;

> *"And with respect to how the Court would act on the license issue, if that zoning issue were to be resolved in Mr. Donovan's favor, in that case I am speaking to the Court in the --- sense of Judge Kern, and it may not be Judge Kern who gets to hear that issue once that "stay" is lifted.  At that point, the best Mr. Donovan can do is say, and we have a record, and that's --- aside from the fact that we have testimony and we had a pro se going forward, we have a record that he could pay for, that would indicate that, at least, Judge Kern's inclination was to demand that the Commission grant the license."* (Exhibit 10, page 61).

20.) At the public hearing (July 31, 2003), PJD reviewed his delivery policy; He would deliver to business addresses only Monday through Thursday as indicated in Zoning Settlement. That all persons accepting product regardless of contents (wine related, non alcohol related) would have to show an ID (21 years or older) and sign for product. No product would be left on doorstep unsigned for. A delivery log would be on hand for review by the WLC, Police department, ABCC and other officials. (AR Vol. III 0120 to 0124, TR 12)

21.) Going back to the 1960's and currently, other package stores in Woburn have been allowed to deliver to residential addresses without scrutiny by the WLC. (AR 0375 through 398 and Exhibit 18).

22.) At public hearing (July 31, 2003), PJD reviewed his ID checking policy on walk in sales; that all person purchasing alcoholic product at location through walk in sales would have

to show ID regardless of age. As indicated at the hearing, PJD would have the strictest ID checking policy in the city. PJD is very concerned about underage drinking and drinking and driving and he will do everything possible to avoid it. He will consult with the WLC, DARE Program (PJD's brother is the Woburn Police Dept's DARE Officer), Woburn Police Officials, ABCC Officials and MADD on local and national trends on these issues. (TR 10-12, 14 and Exhibit 5).

23.) At public hearing (July 31, 2003), PJD reviewed his primary target market; Primary Target Market is the 10,000 businesses that operate within a five-mile radius of Woburn's Industrial Park. This includes Woburn, Burlington and Stoneham. Potential corporate customers include General Electric, KPMG Peat Marwick and Morgan Stanley. PJD will not target homeowners. (TR 9).

25.) At public hearing (July 31, 2003), PJD reviewed his advertising policy; he would not advertise his address to discourage walk in business. In addition, PJD will not advertise in local newspapers period. (TR 8, 16 and 53).

26.) At the public hearing (July 31, 2003), PJD indicated that would hire six new people with unemployed Woburn residents given first preference to positions. Job creation is a top priority of the federal and state government. (Exhibit 2, TR 15).

27.) According to testimony in 1998 by Chairman of the WLC - Maguire, the WLC does not have any methodology in place or method in place to determine "public need" other than MGL c. 138. (Exhibit 11, page 4).

28.) The Town of Burlington is north of the city of Woburn has the highest concentration of full package stores per population than all surrounding towns at .00022%. Woburn is at .00019%. (Exhibit 17 and Exhibit 17A).

29.) On July 31, the WLC voted 2 to 0 to reject PJD's application with actual drafted decision dated August 5, 2003. (Exhibit 1 to Complaint, TR 73).

31.) On August 1, 2003, PJD sent a letter to the WLC asking them to reconsider their decision of July 31, 2003. PJD requested that the WLC oversee a blind survey to be sent to

1   PJD's primary market to address "public need" at proposed location. The WLC refused request.

2   (Exhibit K to Complaint).

3      32.) PJD grew up in Woburn and was educated in the Woburn School system. PJD has

4   four brothers to which two still reside in Woburn. PJD father, Dennis, was Chairman of the

5   WLC Commission from 1984 to May 1996. Mr. Donovan passed away in May 1999. PJD

6   mother still resides in Woburn. Many of PJD childhood friends still reside in Woburn. PJD is

7   well versed in local politics.

8      33.) Maguire was appointed to the WLC in 1984 by Mayor Rabbitt. Wentworth was

9   appointed to the WLC in May 1996 by Mayor Dever. McCaffery was appointed to the WLC in

10  March 1997 by Mayor Dever.

11     34.) In November 1995, Peter J. Donovan started a writing campaign speaking out

12  against members of the Woburn License Commission, Mayor Rabbit (1984 – 1995), Mayor

13  Dever (1996 – 2001), Building Commissioner (Paris) and the former City Solicitor (Robertson)

14  on how they handled the proceedings against BBWC/PJD. This campaign included lawsuits

15  suing city officials and WLC's members as individuals (Wentworth, Maguire and McCaffery).

16  Based on this campaign against city officials, the District Attorney concluded that WLC was

17  violating Open Meeting Laws and the City Council concluded that the WLC was illegally

18  appointed under MGL. 138.

19     35.) It is alleged that based on the history and the "street" value of this 8th Package Store

20  License, that this license was "promised" to someone who is "very" politically connected in the

21  city of Woburn as a "payoff". Just recently, rumors have surfaced that Oliver Galante still wants

22  this license. The Galante matter is well documented in the AR. (AR 0049-0050, 0084, 0153-

23  0167 and not limited to).

24     36.) In February, 2000, historian and local attorney John D. McElhiney published

25  "Woburn – A Past Observed". This book outlines the history of Woburn from the late 1800's to

the late 1970's.  In the book, he outlines who received these particular package store licenses and he quotes the following: (Exhibit 14, page 381).

> *"The barrooms and taverns had been gone since 1944, but the voters had continually opted to keep the package stores, and indeed, before the decade was over, the population increase would merit a sixth license as well.*
>
> *As is implied from earlier footnote, these licenses, once obtained, aren't given up very easily.  Not surprisingly, therefore, the process to obtain one, and to keep one, could always be counted onto provide for an interesting story, with perhaps just a wee bit of good natured politics somewhere in the background."*

37.) On August 28, 2003, pursuant to G.L. c.249, s.4, this appeal was filed.

## IV. ARGUMENT

**A.  THE WLC'S DECISION IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE:**

While the WLC may find that such a type of business is not in the best interests of the public and serve the public good, (AR 103, Exhibit A to Complaint), there must be substantial evidence in the record to support its findings. *Arthur v. Board of Registration in Medicine*, 383 Mass. 229, 418 N.E.2d 1236, 1236, 1241 (1981)*, Goodridge v. Director of Employment Security*, 375 Mass. 434, 377 N.E.2d 927, 929 (1978).  "Substantial evidence" means evidence as a reasonable mind might accept as adequate to support conclusion". *Trustees of Forbes Library v. Labor Relations Commissions*, 384 Mass. 559, 428 N.E.2d 124, 130 (1981).  Substantial evidence, however, is more than just some evidence to support the conclusion of an administrative agency. *Cohen v. Board of registration in Pharmacy*, 350 Mass. 246, 253, 214 N.E. 2d 63, 67-68 (1966).  Furthermore, licensing boards are required to consider each application on its merits and are not allowed to base their denial on a general policy that no further licenses will be issued.  See *Turnpike Amusement Park, Inc. v. Licensing Commission*, *343 Mass. 435, 179 N.E. 2d 322 (1962)(Court reversed local board's denial of license to operate pinball machines based on a general policy not to issue any such licenses.)  Also see Judy A.*

1   _King d/b/a McDonald's Restaurant v. Woburn License Commission, et. al._ docket number 96-

2   04392B (Middlesex Superior Court).

3       The transcripts indicate that the WLC based its decision on testimony from Paul

4   Wentworth that he did a survey in November 2001 and that his survey results indicated that

5   Woburn has the highest ratio of package store licenses per thousand people of population than all

6   surrounding towns. (TR 54, Exhibit A to complaint).

7

8       Owen McCaffery indicated that it was his _personal opinion_ (emphasis added) that we've

9   got several liquor package stores here now. We all kinds of licenses, restaurants, and there's

10  enough liquor in Woburn. (TR 31)

11      The WLC was also worried about delivery and the possible future transfer of license.

12      The WLC was also worried that PJD would sell license in future or relocate license. (TR

13  50,51,75).

14      The WLC, however, do not cite, nor does the Transcript's include, generalized evidence

15  nor specific evidence that support such claims. "A mere speculation concerning a matter of fact

16  cannot form and adequate foundation for the … decision." _Blue Cross and Blue Shield of_

17  _Massachusetts, Inc v. WLC Member of Insurance,_ 420 Mass. 707, 710, 652 N.E.2d 135 (1995).

18      The only two citizens' who spoke in opposition to PJD's application were Paul and Lori

19  Medieros (TR 36 – 43). Both have been sued by PJD in the past. Mr. Medieros is the Woburn

20  City Councilman who tried to ban this 8th license in 1996 and failed (AR 0419). Please note,

21  Medieros's proposed bill to ban 8th package store license was driven by the politically connected

22  package store owners in the city of Woburn to limit competition. Medieros received monetary

23  donations from these package store owners in and around the time this bill was proposed.

24

25      PJD, on the other hand, offered a comprehensive business plan (Exhibit 2), other Exhibits

and offered oral presentation detailing the following; a brief historical overview on his dealings

with the WLC since 1995, gave an overview of his primary market, gave an overview of his

1  product to be sold, gave an overview of his internal policies regarding deliveries and ID

2  checking, gave an overview of hours of operation, gave an overview of his management team

3  and their experiences in the wine and spirits industry, gave an overview of the benefits  his

4  company would provide to the city of Woburn, gave an overview of the zoning settlement, gave

5  an overview of the criteria of issuing a liquor license pursuant to  MGL c. 138 s. 15, gave an

6  overview of the public need at said location and gave an overview of relevant case law before the

7  WLC and not limited to. (Exhibit 1).

8      PJD does not present a case where its viewpoint merely differs from that of the WLC.

9  The WLC's viewpoint is unsupported by substantial evidence and, therefore, the WLC failed to

10 meets its statutory burden.

11

12

13 **B.    THE WLC'S DECISION WAS ARBITRARY AND CAPRICIOUS:**

14      Notwithstanding the WLC's allowance of alcohol delivery by licensees (AR 0375-0400

15 and Exhibit 18), a Woburn City Council's 8-0 vote not to allow the WLC to prohibit the issuance

16 of the eighth license (AR 0419), a favorable decision overriding the ABCC decision in 1999

17 from this Court (Exhibit B to Complaint), a Justice from this Court suggesting that she would

18 order this license issued (Exhibit 10), a recent ABCC ruling on point to PJD's matter (Exhibit

19 21) and not limited to, the Court must give weight to the discretionary authority conferred on the

20 WLC by statue. Flint, at 1227. The discretion lodged in the local authorities, however, is not

21 unlimited. _Yerardi's v. Board of Selectman of Randolph,_ 19 Mass.App.Ct. 296, 473 N.E.2d

22 1154, _rev. den_ 394 Mass. 1103, 477 N.E.2d 595. As stated above, insuring that the decision was

23 made fairly and with the appearance of fairness is a factor to be considered. Board of Selectman

24 of Barnstable, at 1017.

25      The decision is arbitrary and capricious in light of the WLC's approval of two licensee's

applications to expand their retail space since August 1995 (AR 0198 and Exhibits 19 and 20,

TR 56,57).  In August 1995 the WLC approved the application of Giles Market, Inc. (d/b/a

Giles Liquors) to change its retail location.  The change resulted in Giles retail liquor sales

space expanding from 500 square feet to approximately 1,700 square feet (increase of 1,200

square feet of retail space).  Then in June 1997, Giles moved again and expanded their retail

space from 1,700 square feet to 5,300 square feet of retail space (increase of 3,600 square feet

of retail space).  Then in June 2000, S&L Liquors relocated and expanded their retail space

from 2,000 square feet to 4,200 square feet (increase of 2,200 square feet of retail space). Both

stores are located near schools, churches and neighborhoods. These increases are in sharp

contrast to the 125 square feet of accessory retail space proposed by PJD (AR 0116, Exhibit 1

and Exhibit G to Complaint).  PJD is not near schools, churches of neighborhoods.  The WLC's

decisions in Giles and S&L matters contradicts its position in PJD's Decision that the public

need for over the counter package stores was already being met.  The decision is also arbitrary

and capricious in light of the WLC issuing said license to PJD in 1995 (AR 0182 to 0183, 0236

and 0458).

　　　　Furthermore, while the WLC offers no explanation for its reluctance to issue a license to

WLC due to its concerns that delivery of alcohol would be to hard to control and the need of

mail order delivery business, it allowed delivery licenses to other licensees, in particular, Giles

Market, Inc. (AR 0381 to 0384), John Doherty d/b/a Woburn Liquors (AR 0385-0389), Doherty

Brothers Market, Inc. (AR 0390-0399) and Colonial Package Store (Exhibit 18).

　　　　Furthermore, Wentworth's "public need" survey of November 30, 2001 which he

concluded that Woburn had the highest issued number of package store licensed issued per

population is clearly wrong.  According to Annual Reports filed with the ABCC by Woburn and

surrounding towns and based on population census from US Census Bureau, the Town of

Burlington has the highest ratio of (5) licenses issued to a population of 22,876 or .0022

percent. Woburn is at 7 licenses issued to a population of 37,258 or .0019 percent. The town of Wilmington is at 4 licenses issued to a population of 21,963 or .0018 percent. (Exhibit 17).

Furthermore, PJD made a good faith effort to relocate from 345 Washington Street to 30 Cedar Street to limit street exposure and walk-in business. (Exhibit J to Complaint). While the WLC have allowed other package stores to relocate to heavily traveled streets. For example, in June 2000, they allowed S&L to relocate to Main Street from Salem Street. Although Salem Street is heavily traveled, Main Street has much more traffic, with more street exposure than S&L's old location. This was the same story with Giles Markets in 1995 when they moved from Montvale Avenue to Cambridge Road.

Furthermore, Wentworth went on record in February 2003 before this court (Donovan, 02-2230), saying that his main focus in granting a new license or license transfer is new owner's years of experience in the business. PJD's management team has over twenty years of direct experience in the wine and spirits industry. The WLC never took this into consideration when making their decision.

Furthermore, PJD is going hire six employees for his company with first job preferences going to unemployed Woburn resident. Putting people back to work is a top priority of the federal and state government. The WLC never took this into consideration when making their decision. Their decision goes against state and federal policy.

Furthermore, PJD has signed an agreement with city of Woburn that he would not have refrigeration, would not sell nips or ½ pints, would not sell condiments, would have signage in windows, would not advertise address in local papers etc (Exhibit G to complaint). While the WLC, disregarded this settlement.

Furthermore, PJD completed two surveys to his target primary target market and the response was there is a public need for his type of service at proposed location. (Exhibit 7 and 8). When PJD indicated to the WLC that he would do another survey to address "public need"

1    to his primary market under WLC's guidelines, they refused to take PJD up on his offer.

2    (Exhibit K to Complaint, TR 59-60).

3        Furthermore, at least fifteen (15) Section 12 licenses (hotel/restaurant on-premise sales)

4    are located in the general vicinity on Woburn Industrial Park. These establishments are geared

5    towards servicing the business people coming in and out of the park on a daily basis. Not one

6    Section 15 license (package store – off premise sales) is located directly in the park, solely

7    servicing the needs of these business people who come to this park. The WLC did not take this

8    into consideration when rendering their decision.

9

10       Furthermore, Wentworth and McCaffery went on record in May 2001 that they only

11   oppose PJD's application because of zoning and not about delivery or the public need factor. In

12   fact, it was Wentworth who sought zoning opinion from building commissioner and November

13   2001 and May 2002. (Exhibit 12, page 61 and Exhibit D, E to Complaint). A more specific

14   statement of reasons for Wentworth's and McCaffery' reversal would "ensure administrative

15   justice" and "encourage public confidence in the administrative process." _Dixie's Bar, Inc. v._

16   _Boston Licensing Board_, 357 Mass. 699, 702, 259 N.E.2d 777, 779 (1970). _Forsyth School for_

17   _Dental Hygienists v. Board of Registration in Dentistry_, 404 Mass. 211, 217 (1982); _V.S.H_

18   _Realty, Inc. v. License Board of Worcester_, 13 Mass.App.Ct. 586 (1982).

19

20

21   **C.    THE WLC'S COMMITTED A MISTAKE OF LAW:**

22       (All under facts section above) PJD's proposed location is located in an industrial park

23   and the nearest package store is 2.5 miles away. This particular industrial park has over 12

24   restaurants with liquor licenses servicing the business patrons that come in and out of the park on a

25   daily basis. There are over 3,000 businesses in Woburn and many are located in this section of

the city. PJD's primary target market is the 10,000 businesses that operate within a 5 miles

radius from proposed location of 30 Cedar Street. PJD did two blind surveys to his primary

market and both indicated that there was a public need for his type of service at proposed

location. (Exhibit 7 & 8). The WLC's Decision stated reason for its denial is as follows:

> "Woburn population is currently 37,258 that would allow "8" licenses to be issued; the guidelines "1" license for each 5,000 population, 2258 are less than ½ of the 5,000 guideline that in this writer's judgement, makes the need marginal. Woburn has the <u>highest ratio</u> of package stores per thousand people of population, than all the surrounding towns, based on a survey by writer done on 11-30-01. Additionally, there are "6" package stores from surrounding towns, that are located near Woburn lines, that range from "2" at approximately 400 yards, and "4" at approximately 1-2 miles" (Exhibit A to Complaint).

This claim or statement is a mistake of law.  In <u>Ballarin, Inc</u>; the Court ruled the following;

> "Statue governing issuance of liquor licenses, though speaking in terms of "public need", is not concerned with in the literal sense of requirement; rather, test includes assessment of public want and appropriateness of liquor license at a particular location. G.L. c. 138, s.23."

The WLC's decision includes the city of Woburn as a whole and use other surrounding

towns licenses issued to support their decision.  The WLC did not take PJD's proposed location

or his primary market into consideration.  And according to WLC Chairman Maguire, the

WLC's method of determining "public need" is G.L. c. 138. (Exhibit 11, page 4). Mr. Maguire

has been on the license commission since 1984.

**D.    OTHER ISSUES:**

1.)    <u>WLC's Acts Were Made With Malice with Intent to Harm Plaintiff and Were Made To Further Delay Plaintiff From Going Into Business Using the Judicial Process As A Delay Tool:</u>

Based on PJD's relentless campaign against the WLC and city officials since 1995, a

reasonable person would conclude that the WLC and other city officials will do anything in their

power not to issue said license to PJD at any cost and will use any means possible to delay

license from being issued.  A perfect example of this is the WLC seeking zoning opinions

(Exhibit E to Complaint) forcing the PJD to appeal building commissioner's decision even

though they had no jurisdiction to do so. *Bradshaw v. Board of Appeals of Sudbury*, 346 Mass. 558, 194 N.E.2d 716 (1963). In Bradshaw;

> "It is not, however, within the jurisdiction of the licensing authority to pass on zoning questions, nor within the jurisdiction of the zoning board to pass on the propriety of the issuance of a liquor license".

All of these actions by the WLC have happened under the *watchful eye* (emphasis added) of the city solicitor and other city officials. These frivolous delays have cost PJD dearly, including but not limited to, PJD missing three holiday seasons (2000, 2001 and 2002). It is estimated that PJD lost $200,000 in personal income since this matter was remanded back to the city by the ABCC in 2000. Including unneeded court cost and court time. Also, in 1995 when the WLC originally issued said license to PJD, he signed a commercial lease in April 1995 that went in default because PJD could not operate his business without license after WLC re-voted to deny license in June 1995. PJD has a summary judgement in Woburn District Court of $16,000 that has accrued to roughly $40,000 because of the WLC's constant denials/delays (Exhibit 22). PJD has incurred legal expenses of roughly $30,000 directly relating to this matter. PJD's dealings with the city of Woburn on this particular matter have also put a n emotional strain on his marriage (Exhibit 4). It does not matter what PJD proposes, the WLC will deny him this license because they dislike him.

2.) Appearance Of Fairness/Bias:

Due to the fact that PJD has been a constant critic of the WLC and other city officials filing a number of lawsuits against them including a Federal RICO Complaint in 1998 that was resolved in 2000. Maguire and Wentworth were direct targets of PJD's campaign. Specifically, PJD filed complaints with state and federal agencies against Maguire on charges that include tax fraud, insurance fraud, violation of RICO, violation of PJDs civil rights for retaliation, criminal conspiracy to which PJD was physically injured and not limited to and he filed complaints on

Wentworth for civil rights violations and RICO violations and not limited to. Also, included in these complaints were former mayor Dever and Rabbitt and other city officials.

In late May 2003, PJD was at the Fairways Pub criticizing the Woburn's Golf and Ski Authority to which lead to PJD from being banned from the Fairway's Pub and its premises. (Exhibit 16). Number one; the Fairways' sub leases from Woburn's Golf and Ski Authority, which is a quasi governmental city board with members being appointed by the mayor and city council. Number two; the Fairways' Pub is located on public property. Number three: the Fairway's has a liquor license issued by the WLC. Number four: PJD has been criticizing the pub for over serving alcoholic beverages for some time. He has reported them to the WLC, WPD and ABCC in 2002 for over serving liquor. On any giving night some ones leaves the pub intoxicated and drives home. This is a political hang out and nothing is ever done by the Woburn Police Department and or the Woburn License Commission.

In February 2003, Wentworth testified before this court that he plays golf at least three to four times per week at Woburn Country Club and that he plays with members of the Golf and Ski Authority. PJD has been a constant critic of the Authority for not giving money to the city of Woburn, while other surrounding towns who own public golf courses contribute a substantial amount of money to each towns coffers. Wentworth also testified that he plays golf with Dick Lynch and Paul MacDonald who PJD has been a big critic of. It was Paul MacDonald's daughter PJD was speaking to in May 2003, not knowing she was MacDonald's daughter.

And, for the incident described in <u>Donovan</u>, 2230 and other matters that have gone on since 1995, *<u>commonsense and case law should prevail that no member of the WLC could be free off all bias towards PJD when they rendered their decision on July 31, 2003.</u>*

It is a matter of long-established law that a body with the authority to grant or deny licenses for government-regulated activities carries out that authority in at least a <u>quasi</u>-judicial function. See, for example, <u>Fay, Petitioner</u>, XV Pick. 243, 248 (1834), in which the authority to

grant or deny a license for the operation of a ferry in Boston Harbor was held to be a judicial function of the Mayor of Boston and the Aldermen. In *Marcus v. Board of Street Commissioners,* 252 Mass. 331, 335 (1925), The Court characterized the exercise of licensing authority by a City commission over an application for a permit to store and sell gasoline as a quasi-judicial function. In so doing, the Court distinguished it from the general discharge purely ministerial duties by a municipality. This was so because

> they (the licensing functions) require a *hearing* and the exercise of *sound and impartial judgment* with respect to conflicting contentions touching *private rights and interests.*

Id. at 335, emphasis supplied. See also *Albano v. Selectmen of South Hadley,* 341 Mass. 494, 170 N.E. 2d 685, 686 (1960), in accord.

In *Ott v. Board of Registration of Medicine*, 276 Mass. 566, 569-570, 177 N.E. 542 (1931), the Court Reviewed a disciplinary action of the Medical Board; the standard of review of that agency's actions consisted, inter alia, of determining whether the board's decision constituted an

> ...affirmative finding upon all the evidence (and) that the action was taken upon adequate reasons sufficiently supported by evidence credible to an *unprejudiced mind guided by sound judgment* and correct rules of law.

(Interpreting *Selectmen of Wakefield v. Judge of the District Court*, 262 Mass. 477 (1928).

This adherence to principles of sound judgment and impartiality are a matter of constitutional requirement; Article XXIX of the Constitution of the Commonwealth states, in pertinent part:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

> *...that there be an impartial interpretation of the laws, and administration of justice. It is the right of every citizen to be tried by judges as free, impartial and independent as the lot of humanity will admit.*

In line with this requirement is the precept that no only must justice be done, but also it must appear to be done.  See, e.g., In Re Troy, 364 Mass. 15, 306 N.E. 2d 203 (1973).  These principles are not limited to the physical confines of a courtroom;

> *...the provision of art.29 of the Declaration of Rights of the Constitution of this Commonwealth are to have no technical or strict construction but are broadly applied to all classes of cases where one is appointed to decide on rights of parties.*

Thomajanian v. Odabshian, 272 Mass. 19, 22 (1930), cited in Beauregard v. Dailey, 294 Mass. 315, 1 N.E. 2d 481, 486 (1936) which held that the Article XXIX mandate of judicial freedom from bias "... extends broadly to all persons authorized to decide the rights of litigants... ."

> *Furthermore,*
> *Due process in administrative proceedings of a judicial nature has been said generally to be in conformity to fair practices of Anglo-Saxon jurisprudence, see Tadano v. Manney, 160 F. 2d 665, 667 (9th cir. 1947), which is usually equated with adequate notice and a fair hearing, see Opp Cotton Mills v. Administrator, 312 U.S. 126, 61 S. Ct. 524, 85 L. Ed. 624 (1941).*

Hornsby v. Allen, 326 F2d 605, 608 (5th Cir. 1964, (emphasis supplied).  The right to due process is also a matter of constitutional dimension, and extends to parties or litigants in judicial or quasi-judicial proceedings under the Fifth, Sixth, and Fourteenth Amendments to The Constitution of the United States and Article XI of the Constitution of the Commonwealth, as it

1    may apply.  In the matter of a breach of due process in a judicial or quasi-judicial proceeding, the

2    proceeding was not constitutionally fair or "due[1], and redress may be sought.

3

4        A demonstration of actual bias or impartiality is a derogation of the due process rights of

5    a party to a proceeding, this is clear.  Se, e.q., Ott, Supra;  Harris v. Board of Registration in

6    Chiropody (Podiatry), 343 Mass. 536, 179 N.E. 2d 910 (1962); Berger v. United States, 255 U.S.

7    22, 41 S. Ct. 230 (1921).  But the appearance of bias or impartiality creates the same derogation.

8    An illustrative case on this point is Board of Selectmen of Barnstable v. Alcoholic Beverages

9    Control Commission, 373 Mass. 708, 369 N.E. 2d 1011 (1977).  That matter involved the

10   granting by the Board of Selectmen of several liquor licenses for the Town to several applicants,

11   while denying the same to others.  Among those denied was one presented by an apparently

12   worthy applicant; among those granted was one presented by an entity, the owner of which was

13   the spouse of one of the members of the Board of Selectmen.  No actual impropriety was alleged

14   or demonstrated in the conduct of the Select person, but she sat on the Board throughout the

15   hearings, deliberations, and decision of the Board on all applications.  The A.B.C.C. remanded

16   all the decisions for rehearing by the Board; the Superior Court reversed the Commission; and

17   the S.J.C. reversed the Superior Court, reinstating the decision of the Commission.  The court

18   held that

19

20       '... the manner in which the proceedings were held and the participation of Mrs.
21       Montagna in decisions relating to the locations of potential competitors was improper...'
         the 'appearance of conflict... is too real and obvious to be ignored.'
22

23

24

25

---

[1] See, e.q., Piona, v. Alcoholic Beverages Control Commission, 332 Mass. 53,

123 N.E. 2d 390, 392 (1954).

Id. at 369 N.E. 2d 1014. The Court went on to cite Albano, Supra, in emphasizing that such a proceeding, whether characterized as "quasi-judicial"    or not, required "impartiality and disinterestedness." Id. Further, the court stated:

> As this court said in the _Albano_ case, _supra_, ... what was to be avoided was 'suspicion or suggestion of action motivated in part by private interest." (citation omitted.) It would not matter that in the end the licenses might be found in a substantive sense to have gone to the most meritorious applicants (an inquiry which the commission did not reach). The procedure was faulty and vitiated the results.

Id. at 369 N.E. 2d 1015, emphasis supplied.

Based on case law and commonsense, no member of the Woburn License Commission could be free from all bias based on what has gone on since 1995 between PJD and city officials and by participating in the proceeding, the proceeding was infected irremediably with at least the suggestion of bias and partiality.

3.) Plaintiff's Due Process Rights Were Violated:

The WLC sought a zoning a decision in May 2002 without having all the material facts to seek such opinion from the building commissioner. When the building commissioner denied the zoning, PJD was forced to appeal this denial onto Woburn's Zoning Board of Appeals then onto this court. The WLC initiated this process, thus coercing PJD to seek such an appeal. The city of Woburn, especially the city solicitor, was well aware that the WLC was seeking these zoning opinions and the city solicitor did nothing. Then when PJD settles the zoning matter, Wentworth and McCaffery deny PJD his license on something else. This is a clear violation of PJD's Due Process Rights under the Massachusetts Constitution.

4.) Plaintiff's Equal Protection Clause - "Class of One" & Rights To Free Speech Were Violated:

The city of Woburn and members of the WLC have allowed package stores to expand in size without addressing public need. They have allowed new restaurants to obtain liquor without

addressing public need. They have allowed package stores to deliver product, without addresses their concerns about delivering to underage drinkers etc. They have allowed direct competitors to operate within the city -- like the Chocolate Truffle and other corporate gift companies. While the WLC has consistently denied PJD this license on public need, delivery etc. PJD has alleged from day one, that these denials are based on his part of him being a constant critic to city officials and members of the WLC. Before March 1995 when the WLC did issue said license to PJD/BBWC, PJD was never a "public" critic of the political system in Woburn. The denials started when PJD became a critic.

In cases of this nature, the Appeals Court has stated that that it must "*consider whether there is cause to believe that the agency, by gross illogic, has arbitrarily singled out and individual from unequal and perhaps invidious treatment*" <u>Yerardi's Moody St. Restaurant and Lounge, Inc.</u>, 19 Mass. App. Ct. at 301. It also stated that "*it would offend equal protection to refuse licenses to one group when others obtained licenses in similar circumstances.* <u>Id.</u>, 19 Mass. App. Ct. at 303, n.9. "*A plaintiff can allege an equal protection violation by asserting that state action was motivated soley by a "spiteful effort to get" him wholly unrelated to any legitimate state objective* ". <u>Esmail v. Macrane</u>, 53F.3d 176 (C.A. 7 1995). "*The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within a state's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents*". *Equal Protection as a "class of one" can be claimed where the plaintiff did not allege membership in a class or group.* <u>Village of Willowbrook v. Grace Olech</u>, 528 US 562, 120 S Ct. 1073. Also see <u>Board of County Commissioners, Wabaunese County KS v. Umbehr</u>, 116 S. Ct. 2343 (1996) on Freedom of Speech.

## V. <u>RESPONSE TO DEFENDANT'S ANSWER TO COMPLAINT</u>

In this motion, the Plaintiff is only seeking judicial review on the license issue (Count One of complaint) and having this Court use it's discretion on Count Two of Complaint making any order that that justice requires (awarding monetary damages such as lost income and court fees etc.).

The Plaintiff has not made any <u>formal</u> claims in his complaint regarding any constitutional violations.  A formal complaint regarding such violations will be filed with this court in near future.

In the complaint, the Plaintiff only suggested that this Court consider these violations when rendering a decision.  In most cases that come before this Court under judicial review and filed under these circumstances a jury hearing has not been allowed and the matters are remanded if this Court sees such violations or at least the appearance of such violations.

Regarding the defendant's defenses; many are just "smoking mirrors" to delay process further - for example; <u>Service of Process was Deficient</u>: A constable delivered the complaint and summons to each defendant within given time frame allowed by law; <u>Failed to Exhaust All Avenues of Appeals</u>: This has been argued before this court and this court ruled in <u>Donovan</u> 02-2230 that PJD did exhaust remedies and it would be a futility to go back to the ABCC, because all the facts are roughly the same when PJD/BBWC went before the ABCC in 1997. Other defenses are irrelevant.

## VI.    <u>CONCLUSION</u>

For the above reasons, the plaintiff respectfully request that this Court issue summary judgement in his favor vacating the decision of the Woburn License Commission for the City of Woburn and ORDERING the WLC to approve Peter J. Donovan's application for an all-alcoholic beverages off premise license and enter any other order that justice may require. The plaintiff submits the accompanying proposed order for the Court's review.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Dated this 10th day of October, 2003

Peter J. Donovan
35 Longmeadow Road
Arlington, MA 02474
781-467-7019 (work)
781-643-2848 (home)